SOUTH CENTRAL BELL TELEPHONE COMPANY, Petitioners,

v.

TENNESSEE PUBLIC SERVICE COMMISSION, Respondent.

Court of Appeals of Tennessee, Middle Section.

Jan. 3, 1979.

Certiorari Denied by Supreme Court March 19, 1979.

430

T. G. Pappas and J. O. Bass, Jr., Bass, Berry & Sims, Raymond Whiteaker, Jr., Gen. Atty., Nashville, for petitioners.

Eugene W. Ward, Gen. Counsel, Thomas E. Midyett, Jr., Asst. Gen. Counsel, Public Service Commission, Nashville, for respondent.

## OPINION

TODD, Judge.

The Tennessee Public Service Commission denied an application of South Central Bell Telephone Company for a rate increase. South Central filed a petition for review in the Chancery Court. The Chancellor reversed and remanded for reconsideration by the Commission. The Commission has appealed.

A brief chronology of proceedings will contribute to an understanding of the issues on appeal.

A *previous* application for rate increase was filed on November 4, 1976, and the Commission rendered its decision thereon on May 4, 1977. This former proceeding is referred to in the record and briefs and has some relevance to the present proceeding; however, records of the former proceeding or the results thereof are not a part of this record.

On July 1, 1977 (58 days after the previous decision by the Commission) South Central filed with the Commission a petition for approval of rate increases in the total amount of $92,000,000.00 per year. The

petition, itself, specifies no details of the proposed rate increase, but refers to "rates to be filed with the Commission." The voluminous record does contain a volume entitled, "proposed tariffs", and an analysis of the revenue expected to be generated by increases in charges for various services identified by code letters, but nothing has been found in the record to show the amount of present rates in conjunction with amount of proposed increase and proposed new rates. In short, this Court has been unable to ascertain from the record the exact amount of the proposed increase in any given size telephone bill. This difficulty is a significant detail but not material or determinative of the questions on appeal.

On December 30, 1977, after extensive investigation and hearings, two of the Commissioners disapproved of the proposed increase and filed a majority opinion. The third Commissioner's dissenting opinion approved an increase of $32,992,000.00.

On February 17, 1978, the Company filed its Petition for Review in the Chancery Court.

On March 17, 1978, the Chancellor entered an order denying an application of the Company to place the proposed rates into effect pending the final disposition of the cause, or in the alternative, to place into effect increases to the amount of $32,992,-000.00 per year.

On September 26, 1978, the Chancellor entered an order providing:

1. The order of the Commission is declared illegal and void as confiscatory and is vacated and set aside.

2. The cause is remanded to the Commission for setting just and reasonable rates.

3. The Company is authorized to place in effect as of October 6, 1978, all of its proposed rates except pay phone rates and charges for directory assistance.

4. The Company is required to give bond for the refund of any increases not ultimately approved with 8.7% interest.

The Commission appealed from the action of the Chancellor and, pending the appeal, this Court superseded and suspended the part of the Chancellor's order allowing implementation of proposed rate increases.

Filing of briefs on appeal was completed on November 16, 1978, and; with the consent of counsel, oral argument was specially scheduled and heard on December 1, 1978. The cause has been accorded precedence and its disposition has been expedited to the utmost possible extent by this Court.

The Commission has filed the following assignments of error:

"1. The Chancellor erred in overruling the Tennessee Public Service Commission's motion to strike portions of the Petition for Review and appendices attached thereto which attempted to bring before the Court the transcript of the deliberative session of the Tennessee Public Service Commission pursuant to TCA 8–4401, et seq.

2. The Chancellor has exceeded his jurisdiction.

3. The Chancellor erred in mandating to the Commission specific test period adjustment methodology and in requiring the Commission to consider and set rates based upon company estimates of future expenses and investment.

4. The Chancellor erred in finding that the Commission's Order did not take into account nor make proper provision for the effect of attrition.

5. The Chancellor erred in finding that the rate of return found by the Commission is not supported by substantial and material evidence.

6. The Chancellor erred in finding that a rate of return can be within the zone of reasonableness but yet not be "fair" and therefore be confiscatory.

7. The Chancellor erred in concluding that the company will earn only 7.5% to 7.6% in 1978.

8. The Chancellor erred in finding and concluding that the Commission's Order was illegal and void."

The first assignment of error complains that the Chancellor considered the record of a "deliberative session" of the

Commission which was not a proper part of its record of proceedings. However, the Commission fails to point out, as required by the Rules of this court, wherein such action of the Chancellor was prejudicial to the Commission.

T.C.A. § 4–514(f) contains a list of seven (7) classes of items which *shall* be included in the "record" in a contested (administrative) case. The making or preservation of a record of the informal conference discussion of a decision is not deemed to be mandatory under ordinary circumstances. However, when the parties are present to hear such discussion or same is recorded by the Commission, counsel have presented no valid reason, and none occurs to this Court, why it is reversible error for the reviewing court to consider such record to the extent that it may be material to the issues on review.

This Court is not impressed that the refusal to strike the record of "deliberative session" resulted in prejudice to the Commission.

The first assignment of error is respectfully overruled.

■ As to the second assignment of error, counsel has again ignored the Rules of Court which require that each assignment of error specify where in the record the alleged error occurred, wherein the action was erroneous, and wherein the appellant was prejudiced by the alleged error. The 124 page brief of appellant is a ponderous and heavily documented treatise on the subject of utility regulation, but it is not specific as to the second assignment. It is assumed that the gravamen of the assignment is that some aspects of the Chancellor's decision were outside his prerogatives in review of administrative decisions. If so, the error, if any, should appear from other, more specific assignments.

For lack of specificity and non-conformity with the Rules of this Court, the second assignment is respectfully overruled.

■ The third assignment likewise lacks conformity to the Rules of this Court, but an effort will be made to deal with the question presented therein.

The order of the Chancellor makes no specific reference to the matters complained of in the third assignment. The only pertinent language in the order is as follows:

"2. This cause is remanded to the Tennessee Public Service Commission for further proceedings for the purpose of setting rates that are just and reasonable for South Central Bell Telephone Company as required and provided by law." (TR 139–A)

There are no other words in the order which remotely suggest a "mandate".

The "Memorandum" of the Chancellor, incorporated by reference into his order, under the heading, "The Test Period", contains the following material statements:

"The Commission contends that there is no accepted rule that a Commission can follow in selecting a test period. The petitioner agrees with that conclusion and so does the Court. Selection of a test period is simply a way accountants go about matching the property of the utility used in serving its customers with the revenues and expenses connected to such service.

However, rates are set for the future. "The propriety or impropriety of a test period or a test year depends upon how well it accomplishes the objective of determining a fair rate of return in the future." (citing authorities)

The words most often used in the cases are "but also for a reasonable time in the immediate future." (citing authority) Where the order of the Commission entered on December 30, 1977 sets the rates for the company, the Court is of the opinion that the year 1978 is a "reasonable time in the immediate future" which must be taken into account in the Commission's order. This does not mean that the year 1978 must be the test period; it simply means that the test period results must be adjusted to take into account known changes that are likely to occur in the immediate future. (citing authority)

The Commission argues that the test period need only be adjusted to take into account the changes up until the time of the order. The Court is of the opinion that the authority cited above answers that contention contrary to the position of the Commission. A rate order which only takes into account the changes that have taken place before the effective date of the order and ignores changes reasonably certain to occur after the date of the order is looking backward and not to the future.

. . . Only two days after the entry of the Commission's order the company was obligated to pay increased medical insurance premiums, wages, and unemployment compensation. The wage contract with the Union included increases certain to take place in 1978. The construction program of the company projected heavy expenditures for 1978. Although the Commission seeks to minimize this item due to the control exercised over it by the company management, the Court is of the opinion that the estimated effect of the construction program (both for the last nine months of 1977 and for 1978) should have been included in the rate base. To ignore these expenses and changes reasonably certain to occur fails to follow the basic purpose of rate making; to set rates for the future." (TR 127, 128, 129, 130, 131)

This Court interprets the quoted language of the Chancellor's Memorandum to state that the *estimated effect* of reasonably expected increases in expenses and investment should be *taken into consideration* in the establishment of a rate structure for the future. So interpreted, it is difficult to conceive how any reasonable person, much less a knowledgeable utilities commission, could differ with the Chancellor's quoted statements.

The Chancellor did *not* state that the Commission should set rates based upon company estimates of future expenses and investment. He merely stated that the Commission should *take into consideration the estimated effect* of reasonably expected

expenses and investments. Moreover, there is nothing in the Chancellor's Memorandum or order which precludes the Commission from refusing to consider any proposed expense or investment which is deemed by the Commission to be unnecessary, improvident or improper. The opinion of the Commission is replete with instances in which the Commission made such determinations as to other matters, and there is nothing in the Chancellor's Memorandum or order to forbid reasonable determinations as to future expenses and investments.

For the reasons stated, the third assignment of error is respectfully overruled.

▆▆▆ The fourth assignment apparently concedes that the Commission was obligated to consider attrition, but insists that proper consideration was given to this aspect of the case.

The Chancellor's Memorandum states:

"Attrition is a term now familiar to rate regulation since inflation and expansion have become a fact of life. The term describes a decreasing return to the company in the future, at fixed rates, because the cost of building lines and installing telephones will inevitably rise while the income produced by that telephone remains the same. In addition, old lines and telephones are constantly coming out of service as old buildings are torn down, massive relocations are necessitated by construction projects in urban areas, and whole neighborhoods change where telephones were in service. Revenue generated by that investment, which is far below the present cost, is lost. Although generally treated separately in rate orders, perhaps attrition is only one facet of the requirement that a rate order look to the future rather than the present or the past. A forward looking order to forecast the property in use and the revenue it produces is one method of compensating for the effect of attrition. Another is to allow a higher return on the present investment so that an average over the foreseeable future will be just and reasonable.

The Court is of the opinion that the Commission's order does not take into account nor make proper provision for the effect of attrition on the rates of return allowed in the order . . .

The Court concludes that this effect on the rate of return the company is earning is demonstrated by the fact that the Commission staff concluded that the rate of return the company would earn for the year 1978 was only 7.57%, even though the Commission's order found the company was earning for the test year, ending March 31, 1977, 8.7%." (TR 131, 132)

From the naive viewpoint of judicial officers untrained in the intricate mechanics and terminology of utility rate-making, "attrition" appears to be a reduction in rate of return on investment because of increases in expenses and investment without compensating increases in revenue. The Chancellor concluded that the decision of the Commission (to deny any increase) was conclusive evidence that the Commission failed to give sufficient and proper weight to the uncontroverted evidence of probable increases in certain expenses and investment during the effective period of the Commission's order. This Court does not interpret the Chancellor's Memorandum or Order to unduly restrict or mandate the acceptance or rejection of any particular projected or forecast change in expenses, investment or income. The Chancellor simply observed that the results reached were inconsistent with the uncontroverted testimony on the subject. While it is true that the Commission, utilizing its own special expertise, may disregard some uncontroverted expert testimony, it is fundamental that the Commission may not arbitrarily and unreasonably disregard uncontradicted testimony. That is, if uncontradicted testimony is to be disregarded, a valid reason for so doing should be stated.

The merits of the Chancellor's finding that the decision of the Commission was unreasonable and illegal will be discussed in connection with the next assignment.

The fourth assignment of error is respectfully overruled.

■ The fifth assignment goes to the merits of the appeal.

The brief of appellant states:

"The Commission, in this case, adopted a historical test period for the 12 months ended March 31, 1977. It adjusted for the annualized effects of all known changes occurring nine months subsequent to the test period. It adjusted for attrition. This produced an 8.7% rate of return. The Commission then made an analysis to determine if the company would have a reasonable opportunity to earn this rate of return for the foreseeable future. The Commission found that the company would have such an opportunity. After all of this, the Commission found, based on the evidence in the record, that the 8.7% rate of return was still within the zone of reasonableness." (AE 68, 69)

Appellant cites the testimony of the expert, Kosh, as follows:

"CHAIRMAN: Are you saying 8.55% is the confiscatory level?

A Just about at that level. You're just at the edge of it, I would say.

Q But you're saying 8.55% would not be confiscatory?

A I think it is at the level. I don't think it's confiscatory at all. But I think if you go considerably below that you will get into the area of what I call economic confiscation." (AE 70)

While it is true that there is some testimony that 8.55% is "at the edge of the confiscatory level", this testimony is not deemed to be substantial evidence that such a rate of return is fair and reasonable. If the Commission is resorting to "brinksmanship" by keeping the Company "on the edge of the confiscatory level", the Commission is not acting reasonably. This is so for two reasons, (1) a rate "on the edge of confiscation" is not reasonable, and (2) the trend of attrition is clearly such that a rate "on the edge of confiscation" will become confiscatory in a short time by the advance of inflation and attrition.

Thus, the testimony of Mr. Kosh is not deemed to be substantial support for the action of the Commission.

Kosh stated that he *recommended* a rate of return of no more than 8.9%. This Court does not equate the *recommendation* of an expert with the factual opinion of an expert. For this additional reason the testimony of Kosh is deemed to be less than substantial support for the Commission's final order. This view of his testimony is strengthened by the fact that all other testimony in the record supports a higher rate of return.

The fifth assignment of error is respectfully overruled.

██ The sixth assignment is largely argumentative, and ignores the principle previously stated, namely, that a rate may produce a profit *for the present* that is acceptable; but, if it is so near the edge of confiscation that the changes in the conditions of each succeeding month are calculated to render the established rate confiscatory, then the established rate is not reasonable.

In other words, a reasonable rate should not be "on the outer edge of reasonableness," but should be sufficiently *inside* the bounds of reason to provide some "cushion", or room for variation without penalizing the Company.

The expression, "bare bones", has no proper place in establishing reasonable rates. "Bare bones" rates are not reasonable. A reasonable rate is something more than bare minimum.

The sixth assignment of error is respectfully overruled.

██ The seventh assignment complains that the Chancellor was of the opinion that the earnings of the Company would not exceed 7.5% to 7.6% in 1978. Again, counsel has ignored the Rule of this Court requiring citation to the record where any alleged error occurred. By searching through the Memorandum and Order of the Chancellor, the following is found in the Memorandum:

"The *Commission staff* also *concluded* that the rates in effect under the May 4,

1977 order would produce a rate of return in 1978 at 7.57% on a rate base of $1,860,-464,000.00. The *company's evidence* using the same adjustments made by the Commission staff *showed* a projected rate of return of 7.62% for 1978." (TR 126, 127) (Emphasis supplied)

"*The proof* in this record, analyzed and carefully audited by the Commission staff, *supports a conclusion* that the company will earn only 7.5% to 7.6% on its rate base for the year 1978." (TR 135) (Emphasis supplied)

No other references to 7.5% or 7.6% are found in the Memorandum or Order. The quotations above are mere references to *conclusions* of the Commission staff and evidence in the record, and do not purport to be findings by the Chancellor. Even if the Chancellor had stated such findings in his Memorandum, and even if they had been incorrect, the error, if any, would be harmless if the ultimate conclusion stated in the order was correct.

The seventh assignment of error is respectfully overruled.

The eighth assignment of error is a general complaint of the finding of the Chancellor that the order of the Commission was illegal and void.

██ Agreement has already been expressed herein with the view of the Chancellor that the Commission erred in ignoring the uncontroverted evidence that, during the years 1977 and 1978, substantial increases would take place in certain expenses and investment of the Company without compensating increase in revenue. Disapproval has already been expressed in respect to the apparent policy of the Commission to enforce a "bare bones" (minimum possible) rate of return in the face of an established trend of increase in expenses and investment and of earnings and cost of living generally. This Court does not consider reasonable the expressed policy of the Commission to "squeeze" efficiency and economy out of the Company by maintaining existing rates in the face of rising costs. It is unrealistic and unjust to say to a regulat-

ed utility: "We will not allow you a fair profit upon your reasonably anticipated operating statistics. You must derive your profit from economies and efficiencies devised by you to offset normal increases in costs." This represents a decision based upon speculation, and not substantial evidence.

If the Commission considers all proper factors and arrives at a rate structure which is low, but not unreasonable, the Courts may not reverse on petition for review.

If, however, the Commission, acting upon pure speculation, ignores uncontradicted material evidence and refuses to give any weight or consideration to it, and if such evidence is of a kind or character that it would naturally be expected to produce a more favorable ruling if considered, then the Commission has acted illegally and the Courts are authorized to vacate the order of the Commission and to require reconsideration on a proper basis.

On these broad considerations, the eighth assignment of error is respectfully overruled.

It should be emphasized that this Court makes no specific finding of fact as to rates, percentages of fair return or any other factor under consideration in this cause.

The finding of the Commission is analogous (though not identical) to a verdict of a jury. In order for this Court (or any court) to set aside a finding of the Commission, the Court must find *as a matter of law* (not fact) that the Commission's order is not supported by substantial evidence, is based upon speculation or is contrary to uncontradicted evidence.

This Court finds as a matter of law that the order of the Commission is contrary to uncontradicted evidence that certain expenses and investments of the Company would substantially increase during 1977 and 1978 and is not based upon substantial evidence but upon speculation. On this basis, the action of the Chancellor invalidating the Commission order and requiring reconsideration is affirmed.

In spite of the inclusion of the Chancellor's Memorandum in his order by reference, it is not considered that such order was a specific "mandate" requiring the Commission to make any specific findings. Neither does the opinion of this Court nor its decree "mandate" any specific findings by the Commission.

The action of the Chancellor and of this Court have no effect except to declare the order of the Commission invalid because of failure to give consideration to uncontradicted evidence of certain increased expenses and investment and speculation as to facts without substantial evidentiary basis, to vacate such order, and to remand the cause to the Commission for reconsideration of *all proper factors,* including any additional evidence offered, and a redetermination of the issues based thereon.

The Commission insists that its previous decision on May 4, 1977, was designed to and did provide a fair rate of return to the Company during the remainder of the calendar year, 1977, and the entire calendar year, 1978. The Chancellor and this Court disagree. However, 1977 and 1978 have now passed, and any rate structure set hereafter will be effective in 1979 and until approval can be obtained for further adjustments. Therefore, after all of the delay heretofore encountered, justice requires that fair rates be expeditiously established and placed into effect without the time-consuming procedure of a new original application to the Commission.

On remand, the Commission will have the benefit of actual operating experience in 1977 and 1978, rather than estimates and projections. It may then hear evidence of probable changes in revenue, expenses and investment during 1979 and succeeding years. As it has done previously, the Commission has the power to reject and disregard *for cause* any projected expense or investment which it considers unwarranted. However, it would be unreasonable and illegal for the Commission to require the performance or expansion of

services for which reasonable allowance has not been made in fixing rates.

The foregoing disposes of the issues presented by the assignments of error. However, one additional matter before this Court merits discussion, consideration and action. As previously stated, the Chancellor, acting pursuant to T.C.A. § 65–520, authorized the Company to temporarily effectuate its proposed rate increases in their entirety (with certain exceptions); and this Court vacated such action by supersedeas. In so doing, this Court stated:

"T.C.A. § 65–520 authorizes the court having the cause under consideration to permit all *or any part* of the proposed increase to be placed in effect under bond. . . .

1. Among the considerations involved in allowance of temporary relief before final decision are:

 a. the probability of irreparable harm to the applicant if the relief is not granted.

 b. the probability of irreparable harm to the opposite party if the relief is granted.

 c. the probability that the temporary relief will be affirmed by the final decision."

Having more adequate opportunity to study the record and having benefit of more comprehensive briefs of counsel since the granting of supersedeas, this Court has found reason to revise somewhat its preliminary findings as to the probability of the approval of a rate increase in the ultimate disposition of the cause.

 As previously indicated, in order to find reversible error (illegality) in the order of the Commission, it is necessary for this Court to find (1) error (in ignoring uncontroverted evidence speculation or lack of substantial supporting evidence) *and* (2) prejudice (in that the result would probably have been different but for the error).

In short, in order for this Court to reverse the Commission, it is necessary for this Court to find as a matter of law that *some* rate increase would probably have been allowed if the Commission had given proper consideration and effect to uncontroverted evidence.

This Court has so found.

 Consequently and consistently, this Court considers itself obligated in honor and justice to consider and grant some temporary relief based upon what it considers the probability of ultimate approval of some increase in rates.

This Court does not consider that there is a strong probability that the entire proposed increase will be approved. This Court does consider that there is a substantial probability that some rate increase will be ultimately approved.

A statement filed by the Company indicates that the revenues received from local service in the year ending June 30, 1977, was $298,641,000.00.

The Company proposed to increase its revenue by $92,000,000.00 per year by increasing various charges on local service. This would increase the $298,641,000.00 previous annual local revenue by approximately 31%.

The staff of the Commission estimated the "revenue deficiency" (need for increased revenues) during 1978 at $27,994,-000.00. A rate adjustment in this amount would increase the previous annual local revenue by approximately 9.3%.

In view of the computations just stated, the uncontradicted evidence in the record, and the statutory authority granted by T.C.A. § 65–520, this Court deems it proper to authorize a temporary implementation of rate increases not exceeding 10% of existing rates.

It is recognized that *if* the Commission had given proper consideration to uncontroverted evidence, and *if*, as found probable by this Court, the Commission had approved *some* increase in its order of December 30, 1977, *such increase* would have been reflected in income and earnings of the Company during the entire calendar year, 1978, which will end before the action of this Court becomes final. It is therefore probable that the Company has already irretriev-

ably lost the benefit of some rate increase for the entire year, 1978. This is a matter for some consideration in allowing a temporary increase and in future rate fixing by the Commission.

The bond, heretofore filed with the Chancery Court, will be continued in effect to guarantee proper refund of increased charges collected but not ultimately approved, with interest, as provided in the Chancellor's order. The authority granted herein for such temporary increase shall become effective if and when the decree of this Court becomes final by affirmance or failure to timely seek review and shall continue in effect during the further consideration of the cause by the Commission and during the pendency of any further judicial proceedings for review of further action of the Commission on the presently pending application for approval of rate increases.

This Court has given due consideration to the record, the briefs and arguments of counsel, and authorities cited therein, but has refrained from citations of authorities to support general propositions which are well established or conceded in the abstract.

Among such propositions and authorities, with which this opinion is deemed to be consistent, are the following:

■ The review of the decision of the Commission has been upon the record preserved by the Commission and transmitted by it to the Chancellor. T.C.A. § 4–523, *United Inter-Mountain Telephone Company v. Public Service Commission,* Tenn.1977, 555 S.W.2d 389; *Public Service Commission v. General Telephone Co. of the Southeast,* Tenn.1977, 555 S.W.2d 395.

■ On petition for review, the Chancellor and this Court are limited to a determination of whether the actions of the Commission are unconstitutional or illegal, are arbitrary or capricious, or are unsupported by evidence which is both substantial and material in the light of the entire record. *Metro. Government v. Shacklett,* Tenn.1977, 554 S.W.2d 601.

■ Substantial and material evidence is such as a reasonable mind might accept as adequate to support a rational construction and furnish a reasonably sound basis for the action under consideration. *Pace v. Garbage Disposal District,* 54 Tenn.App. 263, 390 S.W.2d 461 (1965) and authorities cited therein.

■ In order to be valid, a rate fixed by a regulatory body must be reasonable not only as to the facts in existence on the effective date of the rate but also for a reasonable time in the future. *Southern Bell Telephone and Telegraph Company v. The Tennessee Public Service Commission,* 202 Tenn. 465, 304 S.W.2d 640 (1957).

This Court has likewise refrained from any discussion of the distressing inefficiency of the ponderous judicial procedure prescribed for review of such administrative decisions, the difficulty of a quasi-judicial-quasi-legislative body undertaking to act (through its staff) as an adversary party and at the same time to render an impartial decision, or the position of thousands of small patrons whose individual interests may not be properly represented and protected in such a large, mass proceeding as this. Such matters are of great concern to the members of this Court, but are immaterial to the merits of this appeal and have received no consideration in the disposition of the appeal.

The order of the Chancellor invalidating the order of the Commission and remanding the cause to the Commission for further consideration is affirmed. The supersedeas heretofore granted in respect to other actions of the Chancellor is now reiterated, and his said other actions (in allowing implementation of the full proposed rate increase and enjoining interference with same) are reversed and set aside.

Effective upon the finality of the decree implementing this opinion and continuing until the final determination of the present cause by the Commission and/or the courts, the Company is permitted to place into effect that part of its proposed rate increases which does not exceed 10% of the previously approved and charged rate for each service.

Affirmed in part, reversed in part, remanded.

LEWIS, J., concurs.

SHRIVER, P. J., concurs in part, dissents in part.

LEWIS, Judge, concurring.

I agree that the assignments of error are without merit, that the Chancellor's decree should be affirmed and this cause remanded to the Commission for setting just and reasonable rates.

I also agree that if the Commission had given proper consideration to uncontroverted evidence, it is probable that some increase would have been approved in the Commission's order of December 30, 1977, and such increase would have been reflected in income and earnings during the entire calendar year 1978. I also agree that it is probable the Company has irretrievably lost the benefit of some rate increase for the entire year 1978.

In the present procedural posture and under the confined facts of this case, I agree that this Court, as a court considering an appeal from an order of the Commission, has the power to permit the Company to place all or any part of the rates into effect under bond (see T.C.A. § 65–520(b)), and I am of the opinion, under these confined facts, we have a duty to authorize such a temporary rate increase.

However, I am compelled to point out that the Chancellor, in his order of September 26, 1978, authorized the Company to place into effect as of October 6, 1978, proposed rates and required the Company to give bond for a refund of any increase not ultimately approved with 8.7 per cent interest.

We superseded and suspended that part of the Chancellor's order allowing the implementation of proposed rates and, as such, have denied the Company an increase since October 6, 1978. We now say that at least a part of that rate increase is, under the record before us, justified.

If the Company is ultimately successful, as it was in the Chancery Court and as it has been in this Court, it will have been caused to suffer great and irretrievable losses. It has no remedy to recoup these losses. If the Commission finally fixes compensatory rates, it has no authority to make them retroactive.

If the Company had been allowed to put the rates into effect, under bond, pursuant to the Chancellor's order, and ultimately the increase had not been allowed, there would have been no loss to the utility's users. They would have received a full refund with 8.7 per cent interest.

The Chancellor's order came to us with a presumption of correctness. The burden of overturning this presumption was upon the Commission. I was of the opinion in my Dissent from the Majority Opinion, upon Petition for Supersedeas filed October 24, 1978, that the Commission had not carried its burden. I am, at this time, of the opinion that the Commission has still failed to carry its burden.

While I reluctantly concur with the holding authorizing the Company to implement a temporary rate increase not exceeding ten (10) per cent of existing rates, I would have reinstated the Chancellor's order of September 26, 1978, allowing the Company "proposed rates, except pay phone rates and charges for directory assistance", because I am of the opinion that T.C.A. § 65–520, the facts of this case and the equities require reinstatement.

As Judge Todd so aptly states, it is ". . . probable that the Company has already irretrievably lost the benefit of some rate increase for the entire year, 1978." By our approval of only a temporary rate increase, not exceeding ten (10) per cent, and if ultimately, as could very well be under the record, the Company is granted compensatory rates in excess of ten (10) per cent by the Commission, we have compounded the irretrievable loss.

On the other hand, if the Company is allowed to put into effect its proposed rates and they are ultimately denied, the Company's users do not suffer irretrievable losses. They will receive a full refund, with interest.

SHRIVER, Presiding Judge, concurring in part and dissenting in part.

In the principal opinion Judge Todd sets forth in chronological order the proceedings before the Public Service Commission and in the courts concerning this rate case, hence, in this opinion I will confine my review to the Chancellor's decision and the steps taken to have that decision reviewed in this Court and the Supreme Court.

On September 30, 1978, a Petition on behalf of the Public Service Commission was filed in this Court seeking to supersede and suspend the decree of the Chancellor entered September 29, 1978, wherein it was ordered that the proposed rates of the Telephone Company become effective immediately. So as to preserve the status of the matters in dispute until requisite notice to opposing counsel could be given and a hearing had, I, as Presiding Judge, entered an order providing in pertinent part

"Upon application of counsel for the Public Service Commission of Tennessee, it is hereby ORDERED, ADJUDGED AND DECREED:

1. That the effectiveness of the aforementioned Decree entered by Chancellor Ben Cantrell in this cause on September 29, 1978 be and the same is hereby suspended pending a hearing of the Petition for Supersedeas, which is set for hearing and consideration on Thursday, October 5, 1978, at 2:00 P.M. in the chambers of this Court.

2. That all other matters herein are reserved.

This 30th day of September, 1978.

/s/ Thos. A. Shriver
Presiding Judge, Court of Appeals"

At the conclusion of the hearing on October 5 an order was entered continuing in effect the Stay Order of September 30, "pending a decision and decree disposing of said Petition for Supersedeas."

On October 11, we filed an Opinion and Decree wherein, *inter alia*, we observed that the Commission had filed "Notice of Appeal" from the Chancellor's decree pursuant to T.C.A. § 4–524 and we mistakenly assumed that we might, therefore, allow the case to be presented on the merits. We considered that the previous stay order was continued in effect and proceeded to hold that the Chancellor's decree was final in substance and therefore subject to appeal as a matter of right.

Upon application to the Supreme Court for a writ of Supersedeas to Nullify and set aside the Court of Appeals' decree of October 11, wherein Judge Lewis had filed a dissent, an Opinion and Order by Mr. Justice Harbison, concurred in by Justices Cooper and Brock, was filed holding that the Chancellor's decree was final and appealable and saying that the issue regarding the Chancellor's decree placing into effect the proposed rates *"is now pending before the Court of Appeals as a result of the filing before it of a Petition for Supersedeas by the Public Service Commission on September 29, 1978."* [Emphasis supplied]

Chief Justice Henry filed a separate Opinion concurring in part and dissenting in part stating, "I respectfully dissent from so much of the majority opinion as holds that the decree of the Chancellor is final." After discussing the purpose and function of supersedeas and insisting it is not a proper method of procedure in this case his opinion says, "We first treat the decree of the Chancellor as being final for purposes of this discussion. *A simple appeal would obliterate the Chancellor's decree.* For reasons heretofore pointed out, the decree has not been so nullified." (Emphasis supplied).

By addendum it was pointed out that, while this matter was not before the appellate courts on appeal, "—[it] is appealable at this time" but that no appellate court had up to that time considered the correctness of the Chancellor's action in placing the rates in effect under bond.

Mr. Justice Fones in his partial dissent agreed with the Chief Justice that the Chancellor's decree of September 29, 1978, was not a final decree but he reached a different result in applying the principles governing supersedeas in this case. He states, "Unquestionably the Writ of Supersedeas has as its sole purpose the preservation of the status quo."

On October 18, 1978, following the filing of the foregoing Opinion and Order of the Supreme Court, and the separate partial dissents as above noted, our Court filed an Opinion and Order, Lewis dissenting, noting that the Supreme Court order stated, "The effect of our ruling today is to return this case to that court" (Court of Appeals) "for disposition of that issue" (placing the rates in effect under bond by the Chancellor) "and any other issues which may bear upon the resolution of the Petition for Supersedeas."

Our Order stated:

"It is thus seen that the petition filed by the Telephone Company seeking to have the cause removed from this Court and to stay and superseded the Orders of this Court in this cause was denied and the cause left pending in the Court of Appeals on Petition for Supersedeas . . ."

"Thus, it would seem that the decree entered October 2, 1978 suspending the effectiveness of the Chancellor's decree of September 28, 1978 pending a hearing and consideration of the Petition of the Commission for Supersedeas, and especially this Court's Stay Order entered October 5, 1978 is still in effect."

We then took note of the fact that on that date, October 18, 1978, the Chancellor, pursuant to Motion of the Telephone Company, entered a decree amending his decree of September 29, 1978, by enjoining the Commission, its agents and representatives from attempting to enforce its order of December 30, 1977, or from interfering with the putting into effect the proposed rates. The said decree also granted the Commission an appeal to the Court of Appeals.

We were thus confronted with what appeared to be an anomalous situation. The only way this case has been before the Supreme Court up to this time is by Petition of the Telephone Company for Supersedeas to set aside the orders of the Court of Appeals which had simply issued a stay order to preserve the status quo until the application for supersedeas could be heard and determined. After a third Petition for Supersedeas was filed in the Supreme Court and heard by that Court, another and last order was entered November 8, 1978 Per Curiam (with dissent by the Chief Justice joined in by Justice Fones), which Per Curiam Order is as follows:

"ORDER

On October 26, 1978, South Central Bell Telephone Company filed in this Court a petition, requesting the Court to supersede an interim order of the Court of Appeals. The appeal of the case is pending on its merits in that Court.

In our opinion, the petition fails to demonstrate a sufficient basis for the extraordinary relief requested, and it is accordingly denied at the cost of the petitioner.

Enter this 8th day of November, 1978.
PER CURIAM"

It thus seems that, although the Supreme Court consistently denied the Petitions for Supersedeas and refused to interfere with the jurisdiction of the Court of Appeals, it, nevertheless, apparently, issued certain instructions to the Court concerning our consideration and decision of the issues involved.

Whether the said pronouncements or instructions be regarded as extra jurisdictional and in the nature of dicta, or otherwise, we respect them and certainly have not intentionally ignored them although we did not interpret them as "Mandates" concerning our procedure and ultimate decision of the issues involved.

ABUSE OF DISCRETION

No reference to the question of abuse of discretion is made in the final Per Curiam Order of the Supreme Court of November 8, 1978, wherein it is stated: "The appeal of this case is pending on its merits in that Court."

One reference was made to that issue in a previous order of the Court denying supersedeas. However, the Chief Justice in his dissenting opinion of November 8th discusses the question at length and notes that the

Court of Appeals had not addressed that subject in its previous orders in this case.

Now addressing this question, it was my conception and that of Judge Todd as we considered the Petition of the Commission for Supersedeas, that the final decree of the Chancellor wherein he reversed and set aside the Commission's order, was based squarely on the facts as he found them and on his conclusions of law, and was, in no sense, a mere matter of exercising his discretion. Our preliminary examination of the record together with the briefs and arguments of counsel led to the conclusion that the stay order previously entered should remain in effect pending a hearing and determination on the merits regardless of whether the question of judicial discretion or abuse thereof was involved.

This was true because, on its face, the complex rate structure proposed by the Company and sought to be put into immediate effect by the Chancellor, appears to be highly discriminatory, preferential and lacking in uniformity. If this is true, it would seem to follow that the Chancellor's action was erroneous and, if his action was merely the exercise of his judicial discretion, I would have to say that it might reasonably be characterized as an abuse of discretion.

On the other hand, considering the Chancellor's action in granting the Company's motion to enter an amendatory decree on October 18, 1978, *enjoining the Commission, its agents and representatives from attempting to enforce its order of December 30, 1977, or from interfering with the putting into effect the proposed rates,* this action was taken while the case was pending in the Court of Appeals on the Commission's Petition for Supersedeas and while this Court's stay order was in effect ordering the preservation of the status of matters involved pending further action.

In these circumstances, it seems that propriety would have impelled the Chancellor to refuse to entertain the motion for injunction and, certainly, if the injunction meant what, on its face it appeared to mean, it was improper and I do not hesitate to hold was an abuse of discretion.

## THE MERITS

We begin our deliberations concerning the merits of this case by remembering that rate making of a public utility such as the Telephone Company is a legislative function which has been delegated by the Legislature to the Public Service Commission. Hence, the primary duty of regulating and fixing rates to be charged telephone subscribers by the Company rests with the Commission and not with the courts. When the Commission, pursuant to its statutory power and duty hears evidence and reaches a decision fixing rates to be charged by the utility, that decision is binding on said utility unless, on appeal to the courts the presumption of correctness is overcome by a showing that the decision of the Commission is arbitrary, capricious or illegal and/or that it will result in economic confiscation of the company's property.

As to the factual grounds of the Commission's decision, the courts, in applying the statute, T.C.A. §§ 65–501, et seq., if the order is supported by any material, substantial evidence it will not be set aside or disturbed by the reviewing court. Thus, even though the court may not agree with the conclusions reached by the Commission on the facts appearing in the record, it will not substitute its judgment for that of the Commission in the absence of a clear showing of capriciousness or arbitrariness. *McCullom v. Southern Bell Tel. Co.*, 163 Tenn. 277, 43 S.W.2d 390; *R. R. Co. v. Pub. Utilities Commission*, 38 Tenn.App. 212, 271 S.W.2d 23; *Hoover Motor Exp. Co. v. R. R. & Pub. Utilities Com.*, 195 Tenn. 593, 261 S.W.2d 233.

Section 65–401, T.C.A., defines Public Utilities as including telephone, telegraph or any other like system dedicated to public use.

Section 65–404 vests control and regulation in the Public Service Commission.

*Section 65–422 prohibits any regulation, practice, or measurement which is unjust, unreasonable, unduly preferential or discriminatory.*

*Section 65–514 makes preferences to any person or locality unlawful.*

Section 65–520, *Change of utility rates, fares, schedules—Suspension—Bond—Refunds, inter alia,* provides that any increase or change placed in effect pursuant to this subsection (b) under bond may be continued in effect by the utility pending a final determination by the Commission or, if the matter be appealed, by final order of the Appellate Court. In the instant case, there was no increase or change put into effect by the Commission. The statute continues:

"In the event that all or any portion of such rates or charges have not been placed into effect under bond before the commission, the court considering an appeal from an order of the commission shall have the power to permit the utility to place all or any part of said rates or charges into effect under bond."

While the Court had the power to permit the utility to place all or any part of the said rates or charges into effect under bond, in my view of the matter there was not a proper exercise of discretion on the part of the Chancellor to order the rates or charges placed in effect if, as is seen in this record, the proposed rates, on their face, appear to be excessive and/or discriminatory.

Section 65–521 prohibits unjust rates, schedules or classifications. It provides:

"*65–521. Unjust rate, fare, schedule or classification prohibited.*—No public utility shall

Make, impose, or exact any unreasonable, unjustly discriminatory or unduly preferential individual or joint rate, or special rate, toll, fare, charge, or schedule for any product, or service supplied or rendered by it within [the] state."

In the Brief and Argument filed by counsel for the Commission in support of its Petition for Writ of Supersedeas, it is asserted, "This is the largest utility rate increase ever requested or granted in the State of Tennessee. Examples of the magnitude of this increase for residence one-party lines and business one-party lines, respectively, are: Chattanooga 41% (Residence) 40% (Business); Clarksville 47%

(Residence) 49% (Business); Knoxville 41% (Residence) 40% (Business); Lynchburg 69% (Residence) 85% (Business); Memphis 40% (Residence) 39% (Business); Murfreesboro 47% (Residence) 49% (Business); Nashville 41% (Residence) 40% (Business); Springfield 58% (Residence) 65% (Business)."

We have searched this voluminous record for evidence supportive of the above quoted argument and data showing the effect of the proposed rates as applied to the various localities mentioned. Much of the record in the seven or eight volumes of tariffs and other exhibits are well nigh unintelligible to one who is not trained in the rate-making process. However, in the testimony of witnesses and the various exhibits I have found evidence supporting the above quoted statement and figures.

For example we find among the exhibits certain estimated monthly increases per line ranging from $1.85 to $20.40. In Book III, Ex. 5 "Data Supporting Filing T.P.S.C. Docket U 6493 July 1977," various rate groups are listed showing "Present IFB rates," also there are schedules showing "Proposed IFB rates" along with proposed revenues as compared with existing revenues and many variations are to be observed in the schedules as they apply to the several groups.

In this volume rate changes in the proposed schedule as compared to the existing schedule of charges are shown as they apply to various cities and towns in Tennessee and these together with other evidence in the record support the above quoted statements made in the Brief and Argument of counsel for appellant.

This being true, it appears to me that the proposed rates, on their face, are unduly preferential and discriminatory. In view of these facts how can it be successfully argued that the proposed rates are just and *uniform across the State* as is required by the statutes of Tennessee?

For the reasons indicated I conclude that the Chancellor's decree putting the proposed rates into effect should be reversed.

Accordingly, I concur in the opinion written by Judge Todd in overruling Assignments 1, 2 and 3 for the reasons given therein.

As to the fourth assignment, I do not fully agree with the Chancellor's conclusions regarding attrition and the alleged lack of consideration given it by the Commission, hence, I do not fully agree with Judge Todd's conclusions concerning the assignment. However, I would not reverse the Chancellor on this assignment alone.

I would sustain Assignment No. 5 which charges error in finding that the rate of return found by the Commission is not supported by substantial, material evidence.

I would also sustain Assignment No. 8 which charges error in concluding that the Commission's Order is illegal and void.

As to Assignment No. 6, it seems to me that if a rate is found to be within the range and zone of reasonableness it is illogical to hold that, nevertheless, it is confiscatory.

In *Southern Bell Tel. & Tel. Co. v. Pub. Serv. Com.*, 202 Tenn. 465, 304 S.W.2d 640, it was held:

"What is a reasonable rate of return for utility is not necessarily any particular figure or decimal point but is one that is in the zone of reasonableness."

Concerning Assignment No. 7, I think the Chancellor's conclusion as to the rate of return to the Company afforded by the rates in effect is not fully supported by the record. However, I do not find it necessary to discuss and pass on these two assignments (6 and 7) in view of my decision as to the other assignments.

## MY CONCLUSION

Thus it is that I concur in the results stated in the last two paragraphs of Judge Todd's Opinion, as follows:

"The order of the Chancellor invalidating the order of the Commission and remanding the cause to the Commission for further consideration is affirmed. The supersedeas heretofore granted in respect to other actions of the Chancellor is now reiterated, and his said other actions (in allowing implementation of the full proposed rate increase and enjoining interference with same) are reversed and set aside.

"Effective upon the finality of the decree implementing this opinion and continuing until the final determination of the present cause by the Commission and/or the courts, the Company is permitted to place into effect that part of its proposed rate increase which does not exceed 10% of the previously approved and charged rate for each service."