**AMERICAN ASSOCIATION OF RETIRED PERSONS, Tennessee Protection and Advocacy, Inc., Cleo Stinnett, et al., Tennessee Payphone Owners Association, Petitioners/Appellants,**

v.

**TENNESSEE PUBLIC SERVICE COMMISSION and BellSouth Telecommunications, d/b/a South Central Bell Telephone Company, Respondents/Appellees.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Sept. 21, 1994.

Permission to Appeal Denied by
Supreme Court Feb. 27, 1995.

**130**

---

William H. West and Deborah T. McCormick, Nashville, for appellant American Association of Retired Persons.

Cynthia Leigh McLendon, Memphis, for appellant Tennessee Protection and Advocacy, Inc.

Clark H. Tidwell, Nashville, Gordon Ball, Knoxville, J. Forrest Hinton, New Orleans, LA, for appellants Cleo Stinnett, et al.

Charles W. Burson, Atty. Gen. and Reporter, Pamela Bingham Broussard, Asst. Atty. Gen., Nashville, for appellee Tennessee Public Service Com'n.

Charles L. Howorth, Jr., Nashville, James G. Harralson, Birmingham, AL, for appellee BellSouth Telecommunications, Inc. d/b/a South Cent. Bell Telephone Co.

## OPINION

CANTRELL, Judge.

The petitioners intervened in the proceeding below and seek in this court to reverse an order of the Tennessee Public Service Commission (the PSC or Commission) setting rates for the customers of South Central Bell (Bell). Since we find from the record that the Commission acted within its authority, and that its findings of fact are based on substantial and material evidence in the record, we affirm.

### I.

The PSC came up with a plan of regulatory reform, an ambitious undertaking to reform telephone company regulation in Tennessee, in the late 1980's. The plan envisioned a sweeping program to modernize the telecommunications infrastructure in Tennessee by using excess earnings of the telephone companies, i.e. earnings, over and above a just and reasonable rate of return set by the PSC. Other features of the plan were a multi-year forecast of earnings and expenses, a target rate of return, and a formula (matrix) for dealing with the situation where the actual earnings fell above or below the target.

In an earlier appeal we decided that the PSC exceeded its jurisdiction by adopting the plan for Bell in a contested case rather than through a rule-making proceeding. *See Tennessee Cable TV v. PSC*, 844 S.W.2d 151 (Tenn.App.1992).[1] We did, however, hold that the Commission had the power to require a telephone utility to use excess earnings to expand or improve service to its customers.

Even while the former case was on appeal the PSC was promulgating a rule embodying the regulatory reform plan. The pertinent parts of the rule as adopted are:

1220–4–2–.55 **REGULATORY REFORM.**

(1) As an alternate to traditional ratemaking procedures, a local exchange carrier (LEC) may elect to operate under the regulatory reform plan described below.

---

1. For a more comprehensive description of the plans for regulatory reform and the accompanying technology master plan see our opinion in *Tennessee Cable TV*.

The Commission may modify the plan in order to meet the circumstances of a particular LEC as demonstrated by the record before the agency.

(a) The Commission will project the carrier's earnings over a forecast test period of two to four years which will be the period of the regulatory reform plan. Neither the Commission nor the carrier will initiate proceedings to adjust the carrier's earnings during the forecast period except as provided herein.

(b) If under appropriate circumstances and the Commission so directs, all or part of projected earnings in excess of the carrier's prescribed return may be placed in an interest bearing, deferred revenue account and used to implement the technology schedule described in rules 1220–4–6–.01 through 1220–4–6–.05 or for such other purposes as the Commission directs. Interest on the deferred revenue account shall be calculated using the average monthly balance based on the beginning and ending monthly balances. The interest rate for each calendar quarter used to compute such interest shall be equal to the arithmetic mean (to the nearest one-hundredth of one percent) of the prime rate value published in the "Federal Reserve Bulletin" or in the Federal Reserve's "Selected Interest Rates" for the 4th, 3rd, and 2nd months preceding the 1st month of the calendar quarter.

(c) During the forecast period, earnings adjustments for large LECs (70,000 or more access lines) will be made as described in this section. Other LECs may elect to operate under section (1)(c) or under section (1)(d).

(1) If the carrier earns within 60 basis points of its prescribed return on capital, no earnings adjustment will be made.

(2) If the carrier earns more than 460 basis points above its prescribed return, the amount of the excess will be used to benefit the carrier's custom-ers. If the carrier earns more than 460 points below its prescribed return the Commission will take appropriate action to make up the amount of the deficit.

(3) If the carrier earns between 60 and 450 points above or below the carrier's prescribed return, the excess or deficit will be shared with the carrier's customer on a 40–60, 45–55, 50–60, 55–45, or 60–40 basis depending upon the carrier's service rating level as determined by the Commission in accordance with section (1)(f) of this rule.

(d) For small LECs (less than 70,000 access lines) which do not choose to operate under section (1)(c), no earnings adjustment will be made unless the carrier's earned return on equity during the forecast period is more than 200 basis points above or below the carrier's prescribed return. Should that occur, either the Commission or the carrier may initiate rate review proceedings for prospective relief.

(e) If, during the forecast period, changes occur which jeopardize the interests of ratepayers or the financial stability of a carrier, the Commission or the carrier may initiate rate review proceedings for prospective relief.

Bell had been operating under the prior plan while the case was on appeal. Under that plan (referred to in the record as "the 1990–92 formula"), the Commission adopted a forecast of the company's earnings for each of the three years in question. Based on the forecast, showing excess earnings in each of the three years, the PSC ordered Bell to deposit $35.1 million in 1990, $47.9 million for 1991 and $74.3 million for 1992 to the deferred revenue account to be used for extending and improving the company's service.

Actual experience for the three years, however, showed that Bell earned considerably less than the forecast. Understandably, the company wished to avoid getting locked into a two to four year plan that might produce similar results.

In September of 1992 the PSC staff initiated an investigation of Bell's earnings. The regulatory reform rule became effective January 10, 1993. On January 11, 1993 Bell filed a conditional election to operate under the rule. To avoid the uncertainty involved in projecting expenses and earnings into the future, Bell proposed that rates be set on the most reliable data available, that for the first year of the period. Then any departures from the proper rate of return, up or down, would be handled according to the sharing matrix adopted as part of the rule. See paragraph (1)(c) of Rule 1220–4–2–.55 above. Basically the sharing matrix provides that if the company's earnings fall within a range of sixty basis points above or below the targeted rate of return nothing happens. If earnings fall between sixty and four hundred sixty basis points above or below the rate of return, the company and the rate payers will share the good or the bad on a sliding scale governed by the company's level of service. All of the company's earnings above the rate of return plus four hundred and sixty basis points will be used to benefit the company's customers. If the earnings fall more than four hundred and sixty basis points below the rate of return, the Commission will take appropriate action to make up the amount of the deficit.

The PSC issued its order on August 20, 1993 in which it adopted Bell's proposal to use only the first year of the forecast. Then "[if] the first year forecasted rate of return is outside the rate of return range, rates will be adjusted to (produce a return at) the nearest end of the range.... After the initial rate adjustment, the sharing matrix will be used to determine the funds available for future rate adjustments." Other parts of the order will be discussed in connection with the specific issues raised by the parties.

## II.

### a. The Rate of Return

■ The petitioners insist that the PSC's finding that the rate of return should be 10.65% to 11.85% on the rate base is not supported by substantial and material evidence.[2]

The 10.65% to 11.85% return on rate base translates to a 12.44% to 14.44% return on equity. A witness for the PSC staff recommended a rate of return on equity of 12%. Bell's witness testified that the appropriate return on equity was 13.02% to 15.32%. Thus, the range adopted by the PSC in its order was within the extremes found in the proof. See South Central Bell v. Tennessee Public Service Commission, 579 S.W.2d 429 (Tenn.App.1979).

■ The petitioners insist, however, that the testimony of Bell's witness should be rejected because he did not use other telephone companies in his analysis. We find this argument to be unpersuasive. The critical inquiry is not the rate of return on equity of similar companies but the return on equity in enterprises having comparable risks. So. Bell Tel. and Teleg. v. Tennessee Public Service Commission, 202 Tenn. 465, 304 S.W.2d 640 (1957); FPC v. Hope Natural Gas, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). Bell's witness went through an elaborate explanation of why the companies he chose were comparable. The PSC chose to give that testimony credit. We are not persuaded that it should have done otherwise.

### b. The use of the Forecast

■ The petitioners insist that by using only the first year of the three year forecast the PSC has allowed Bell to set rates that are not "just and reasonable." See Tenn. Code Ann. § 65–5–201. This contention is based on the fact that even Bell's figures show that in 1994 the rates set in the PSC order would produce a return on equity of 15.08%; in 1995, 16.7% (compared to the target rate of return on equity of 12.44% to 14.44%).[3]

2. The mid-point of 11.25% would be the starting point for the use of the sharing matrix.

3. This argument, it seems to us, is an oblique attack on the Regulatory Reform Rule itself.

While the projections are above the target rate of return, they are not above the point on the sharing matrix where all excess earnings accrue to the customer's benefit.

■ The petitioners argue, and Bell does not disagree, that rates are set for the future and that the estimated effect of reasonably expected increases in expenses and investment should be taken into consideration in the establishment of a rate structure. *See South Central Bell Telephone Co. v. Tennessee Public Service Commission,* 579 S.W.2d 429 (Tenn.App.1979); *Tennessee Cable TV v. PSC,* 844 S.W.2d 151 (Tenn.App.1992). We take the authorities cited to require that *all* reasonably expected changes affecting the rate of return should be taken into account.

The Commission's findings on this aspect of the case are as follows:

The Staff has raised a legal issue regarding Bell's proposal. The Staff argues that a three year forecast *must* be utilized to set rates so that all "known and reasonably anticipated" changes are taken into account in setting rates.

We are satisfied that the law allows the Commission the discretion to use a forecast test period, a historical test period, or any other accepted method to determine a fair rate of return.

Both the Company and the Staff have proved that forecasting the results of the "out" years (i.e., the second and third years of the forecast) is a problematic exercise. Neither party predicted with any precision in 1990 what actually happened in 1991 and 1992. The causes of the misses cannot be, and probably could never be, identified with certainty. Changes in Tennessee's and the nation's economies, rapid technological change, increasing competition, and regulatory changes could have contributed to the inaccuracy of these predictions.

Whatever the cause may be, however, the potentially perverse results should be avoided. For example, Bell in 1991 earned below the range of 11–12% which was determined reasonable by this Commission. Yet the 1990 order mandated a rate reduction/deferred revenue account (DRA) contribution of $74.0 million in 1992 despite the underearnings in 1991. Continuation of a policy similar to that which we started in 1990 could, if forecasts continue to be missed, result in rate decreases for compa-

nies that need rate increases, and rate increases for companies that are overearning. While our 1990 policies may have been correct in starting regulatory reform, we will not continue a policy that could have such contrary results. In the future, rate adjustments and Deferred Revenue Account contributions flowing from the Company's regulatory reform plan will be based only on actual results. Use of actual results will allow us to take into account all changes, known or unknown, reasonably anticipated or ignored by any forecast.

Basing future adjustments only on actual results is also consistent with our view of how regulatory reform ought to work. Companies that have been operating under a Regulatory Reform Plan have made decisions for which they should bear at least part of the potential consequences and reap at least part of the potential rewards. By focusing only on actual results, the Company will share in the consequences of earnings outside its authorized rate of return range, and will not be shielded or disincented from those consequences by a stale and speculative forecast adjustment.

■ It seems to us that the quoted part of the order amounts to a finding that the projections for 1994 and 1995, by either the Commission staff or by the company, are *not* certain to occur and are in reality too speculative to be adopted. Based on the results from the 1990–1992 plan that finding would not appear to be unreasonable. Although the economic climate in the recent years has been relatively stable, the other factors mentioned in the order—rapid technological changes, increasing competition, and regulatory changes—may have made what was already an inexact science even more untrustworthy. As the Court said in *Powell Telephone Company v. Tennessee Public Service Commission,* 660 S.W.2d 44 (Tenn.1983), the Commission has the discretion to choose a historical test period, a forecast period, a combination of the two, or any other accepted method in rate making. We find no error in the Commission's action in using only the first year of the forecast.

### c. Retroactive Rate Making

The petitioners read the regulatory reform rule and the Commission's order as authority for the Commission to fix rates retroactively or to order refunds in violation of state law. They cite the rule's provision that earnings in excess of a certain range will be shared by the company and its customers. Above a certain point all of the excess accrues to the customer's benefit. It is true that the Commission has no statutory authority to fix rates retroactively or to order refunds except in very limited circumstances. *See South Central Bell v. Tennessee Public Service Commission,* 675 S.W.2d 718 (Tenn. App.1984); Tenn.Code Ann. § 65–5–203. The order provides:

> If the first year forecasted rate of return is outside the rate of return range, rates will be adjusted to the nearest end of the range. If the forecasted rate of return does not fall outside of the range, no rate adjustment will be made. After the initial rate adjustment, the sharing matrix would be used to determine the funds available for future rate adjustments.

The regulatory reform plan, however, does not require refunds to customers nor does it provide for rates to be adjusted retroactively. Neither does the quoted portion of the order. Both speak in prospective terms. The rule speaks of sharing the excess earnings with customers either through prospective rate reductions or through service improvements. In *Tennessee Cable TV v. PSC,* 844 S.W.2d 151 (Tenn.App.1992), we held that the Commission had the authority to require a utility to use its excess earnings in that way. We think neither the rule nor the order results in retroactive rate making.

### d. Erroneous Findings

The petitioners allege that two findings in the order are patently incorrect. The first is a finding that Bell originally forecast a 11.45% return for 1993; the second is a finding that the order's treatment of Bell's yellow pages revenues has only a "slight impact" on the company's forecast.

The yellow page revenue dispute, discussed in the order under BAPCO (for Bell South Advertising and Publishing Company), is a disagreement between the company and the Commission staff over the growth of revenue from yellow page advertising over the three year period. The order adopts the staff projection which is $24.2 million higher than the company projection. The petitioners argue, however, that the order failed to add the increased revenue to the company's projected earnings for 1993, an $8 million error if the increase is averaged out over the three year period.

The record reflects, however, that the staff did not project a uniform difference between its estimates and Bell's estimates over the three year period. The difference for 1993 was only $3.8 million. The Commission's finding on this issue is:

(e) *Conclusion*

Our rulings on the L.M. Berry issue discussed in (b) above and the BAPCO issues discussed in (c) above have only a slight impact (See Appendix A, page 1) on the Company's forecast of an 11.45 percent return on rate base for 1993. After the change made for Inside Wire, the forecasted return for 1993 is approximately 11.75% and thus falls within the rate of return range approved in this Order. Accordingly, no rate adjustment based on the forecast is ordered.

The combined effect of the three categories mentioned in the order is a $2.8 million increase over Bell's projected income. Assuming that the petitioners are correct in their analysis, the extra income would make a difference in the rate of return of approximately seventeen basis points.

We are not persuaded, however, that the petitioners' analysis is correct. In the appendix to the Commission's order the entry showing the differences between the staff and Bell in the category labeled "miscellaneous revenues"—which includes the BAPCO revenue—reflects only a $600,000 difference. In either case the difference does not affect the results in a material way.

With respect to the Commission's finding that Bell projected an 11.45% return for 1993, we find evidence in the record from which that conclusion could be drawn. Bell's

rebuttal witness testified that the 1993 forecast of 11.60% return on investment was reasonable but might be overly optimistic in light of the company's actual earnings for January and February of 1993 (10.56% and 10.7%). The witness said, "Based on these year-to-date actuals, it will be difficult for the company to earn its forecasted 11.60% ROI...." He produced an exhibit summarizing his testimony and showing an 11.50% return on rate base.

We think there is substantial and material evidence in the record for the Commission's finding.

### e. The Failure to Make Findings of Fact

■ After the hearing in April of 1993 the Commission asked Bell and the PSC staff to file a joint exhibit showing where they disagreed and the dollar amount of the disagreement. Attached to the Commission's order as appendix A, the exhibit lists twenty-three areas where the company projections differ from the staff projections. One petitioner insists that the Commission's order is invalid because it fails to make detailed findings of fact on thirteen of the disputed areas. *See C.F. Industries v. Public Service Commission*, 599 S.W.2d 536 (Tenn.1980); Tenn. Code Ann. § 4–5–314.[4]

In these areas the Commission found, in substance, that the company's forecast was more in line with the actual results from prior years and that, with exceptions, the company's forecast should be adopted. While we believe that the order referred to the actual results of the overall rate of return and not to the results on each particular item on the list, we also believe that the finding is sufficient.

4. Also cited is Tenn.Code Ann. § 4–5–113 which dealt with an agency's duty to make findings of fact. That section, however, was repealed in 1982. The current law, found in Tenn.Code Ann. § 4–5–314 provides:

(c) A final order, initial order or decision under § 50–7–304 shall include conclusions of law, the policy reasons therefor, and findings of fact for all aspects of the order, including the remedy prescribed and, if applicable, the action taken on a petition for stay of effectiveness. Findings of fact, if set forth in language that is no more than mere repetition or para-

■ Agency findings should be specific and detailed enough to allow the courts to conduct a meaningful review of the agency's order. *Levy v. State Bd. of Examiners*, 553 S.W.2d 909 (Tenn.1977). In adopting the overall forecast presented by the company, the Commission chose to believe one version of highly controverted testimony. And, while the order does not deal with each controverted fact individually, the court has no difficulty in following reasons why the Commission acted as it did.

### f. The Inside Wire Issue

As used in this record the term "inside wire" refers to the telephone wires inside the walls of the customer's house. There are two separate aspects of the inside wire issue. The first is the installation, which Bell may perform or which may be done during the original construction or afterwards by independent contractors. The second is the maintenance. Bell will maintain the inside wires for a monthly fee or the customer has the option to provide for his own maintenance service and pay for it as needed. If the customer chooses this option he may contract with Bell or another contractor to do the repairs.

The Commission found that all of the components of the company's inside wiring business were subject to competition. The order, consequently, required the company to account for all inside wire operations "below the line", i.e., the income and expense related to this business would not be taken into account in calculating the company's revenue requirement.

■ The petitioners do not dispute the action taken with respect to the wiring instal-

phrase of the relevant provision of law, shall be accompanied by a concise and explicit statement of the underlying facts of record to support the findings. The final order, initial order or decision must also include a statement of the available procedures and time limits for seeking reconsideration or other administrative relief and the time limits for seeking judicial review of the final order. An initial order or decision shall include a statement of any circumstances under which the initial order or decision may, without further notice, become a final order.

lation and the repair of inside wiring on a contract basis. They do, however, dispute the Commission's finding that there is sufficient competition to allow similar treatment of the maintenance business for which Bell charges its customers a monthly fee. Bell initially advocated accounting for all the installation and repair business above the line; it now takes the position that wherever it is treated it should be treated as a whole.

The petitioners do not cite any authority holding that a certain level of competition should be achieved before below the line accounting is proper. They simply assert that Bell has a virtual monopoly on the maintenance business. While that may be true as to the component of the repair business paid for through monthly fees, it is not true with respect to all maintenance. If customers have the option to join the company's monthly service plan or not, it cannot be said that the company has a monopoly on the service.

We think the Commission had the authority to treat the inside wire issue as a whole and that its decision to require Bell to account for it below the line is supported by substantial and material evidence.

■ One set of intervenors representing a class of plaintiffs involved in litigation with Bell over its charges for inside wire repairs requests this court to reverse the Commission's findings in its order that Bell is losing money on its inside wire service and that the charges for such services are reasonable. They, however, do not cite any evidence in this record to the contrary. The evidence they do cite is from depositions taken in the other case and is not properly before us. Even that evidence, however, contains admissions that this record shows a loss for the inside repair business. The staff witnesses deposed by the intervenors expressed some doubt about the accuracy of the numbers, but they offered no proof in support of their suspicions.

We decline to modify the order.

**g. Amendment of Regulatory Reform**

■ One petitioner asserts that the Commission has altered the regulatory reform plan without going through the proper rule

making procedure. This argument stems mainly from the Commission's election to use only the first year of the three year forecast when the regulatory reform plan says a two to four year forecast will be used.

The plan also says, however, that it may be modified "to meet the circumstances of a particular LEC as demonstrated by the record before the agency." We do not think the Commission departed from the rule in a manner that signaled a shift in policy requiring the adoption of a new rule. Where the rule itself says that adjustments may be made to meet the particular circumstances, the Commission may make those adjustments if the record justifies it.

### III.

■ One of the intervenors, Tennessee Protection and Advocacy, Inc., asserts that the Commission did not intend to arrive at an honest forecast for 1993 because Bell's president suggested to one of the commissioners that the Commission deliberately underestimate Bell's earnings. This allegation is based on a conversation that took place early in 1992 in the commissioner's office in the presence of the Commission's utility rate division director. At the hearing before the Commission the following exchange took place between the Commission's general counsel and Bell's president:

Q. Mr. Ezell, have you ever suggested that perhaps it would be good policy for the Commission to underestimate or take a conservative estimate of the company's earnings in order to have retroactive sharing down the road? Have you ever suggested that?

A. I am not sure I understand exactly what you mean by that question. Are you saying would I suggest to the Commission that they should underestimate our earnings?

Q. Yes, in order to have retroactive sharing.

A. I do not think I have suggested that.

Q. Do you ever recall suggesting that to Mr. Burcham?

A. I don't recall meeting with Mr. Burcham but once or twice, and if I said that I am not certain.

Q. Let me refresh your recollection. Early 1992 you were in the room with Mr. Burcham, and I believe you used the words "wouldn't it be fun if we had a conservative estimate of the company's earnings and had earnings to share down the road?" Do you recall saying that?

A. No.

Q. Never said that?

A. Not in those words. I certainly don't recall—what I recall saying in that situation was it would be nice for the customer if we were able to over earn and they would share.

Q. Remember using the word, wouldn't it be fun?

A. No, I do not remember using the word "wouldn't it be fun."

Q. Remember who else was in the room?

A. If I recall there was Commissioner Hewlett and Frank Harris.

Q. Do you recall Mr. Burcham replying, it would be fun, but it would be wrong?

A. No.

Neither of the other parties cross-examined Mr. Ezell on this conversation.

Later, when Mr. Burcham was asked to give his version of the conversation, the Commission chairman excluded it as irrelevant. No objection was raised at the time and neither of the parties made an offer of proof to preserve the excluded testimony. When asked how the evidence was relevant, the Commission's general counsel said, "Mr. Chairman, we do feel, of course, it goes to the credibility of the company's reputation, and I normally would not...."

Nothing further happened until the briefs were filed on appeal—no petition to rehear, no further proof on the point, no motion for the commissioners to recuse themselves. But, Tennessee Protection and Advocacy, Inc. argues on appeal that we should conclude that the Commission intended to deliberately and dishonestly understate Bell's earnings for 1993.

We find no merit in this contention. The evidence was not offered to show a corrupt agreement between Bell and one of the Commission members. As the record shows, it was offered only to reflect on Bell's credibility. If anyone had evidence of anything more, good sense and a public duty required a prompt disclosure.

We affirm the Commission's order and remand the case to the Commission for further proceedings. Tax the costs on appeal to the petitioners.

TODD, P.J., and LEWIS, J., concur.