SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY

*v.* .

THE TENNESSEE PUBLIC SERVICE COMMISSION, et al.

(*Nashville,* December Term, 1956.)

Opinion filed July 29, 1957.

466 

468

Harold Seligman, Nashville, and George Shuff, Ripley, for appellant Commission.

Russell Rice, Jackson, E. K. Meacham, Chattanooga, Jesse M. Vineyard, Memphis, Raymond H. Leathers, Nashville, John J. Duncan, Knoxville, E. W. Hale, Jr., County Attorney, Memphis, for intervening Cities.

Geo. T. Lewis, Jr., Memphis, J. O. Bass, Nashville, Waring, Walker, Cox & Lewis, Memphis, Bass, Berry & Sims, Nashville, of counsel, for appellees.

Mr. Justice Burnett delivered the opinion of the Court.

On November 10, 1954, the Telephone Company filed with the Commission a schedule of increased rates and charges to become effective on December 10, 1954. These proposed rates and charges were based on the Telephone Company's operations, costs, conditions, etc., for the year preceding June 30, 1954. It proposed by these rates

to get an additional gross revenue of $9,800,000 annually or additional net revenues of $4,435,000 annually. Obviously, and of necessity, its contention was that this was necessary so that it have a fair rate of return upon the fair value of its properties.

██ ██ At common law a public utility had the power to fix its rates. In Tennessee, in reference to intrastate rates, it still has this power subject to the provision of Section 65-520, T.C.A. Under this section of the Code the Commission has the power, and exercised it in this case, to suspend these rates that the Telephone Company contended for from time to time until it determines by proof, investigation and otherwise what is a just and reasonable return to the Telephone Company. After the Commission has fixed the rate, there is a presumption that this rate is correct, and any party complaining about the rate has the burden of proving that it is illegal or unjust and unreasonable. *Kentucky-Tennessee Light & Power Co. v. Dunlap,* 181 Tenn. 105, 178 S.W.2d 636.

These proposed rates of the Company were suspended by the Commission during its hearing of proof and investigation until January 28, 1956, when it rendered its final order. By this order the Telephone Company was allowed additional gross revenues of $2,996,900 or a net annual increase of $1,350,000. By this same order the rates as proposed by the Company were permanently suspended.

Within 30 days after this final order of the Commission the Telephone Company filed in the Chancery Court its petition for *certiorari* as is provided by Sections 27-801 to 27-823, T.C.A., inclusive, to determine whether or

not the Commission had acted in excess of the power conferred upon it by statute, alleging certain specific errors in the findings of the Commission. This petition was subsequently amended and then amended again on April 10th, to, for the first time, allege that the rates fixed were confiscatory.

Proceedings in the lawsuit through this final amendment are not necessary to a decision in this case because under this portion of the bill and the allegations thereunder the matter was determined against the Telephone Company and no complaint is here made. Suffice it to say that these proceedings so far under the petition and various amendments filed to this point failed to allege a factual situation of confiscation and were largely proceedings under the writ of *certiorari* which naturally has a very narrow scope. *Hoover Motor Express Co. v. Railroad & Public Utilities Comm.*, 195 Tenn. 593, 261 S.W.2d 233; 23 Tennessee Law Review, p. 349.

By leave of court the Telephone Company filed on June 6, 1956, its amended and supplemental bill, which it asked to be treated as an original bill, in which it factually alleged facts. It claimed the rates as put into effect by the Commission were confiscatory and unconstitutional as violative of Article I, Sections 8, 17 and 21 of the Constitution of Tennessee.

Thus we have an action here not under the narrow confines of a petition for *certiorari* as above indicated but under the broad inherent powers of a court of Chancery. In such a case where the question is presented as to whether or not the prescribed rates of the Commission are confiscatory this brings it to a question

that is beyond legislative power and solely within the power of the Court. Under such an allegation of facts, if they are established, this amounts to a violation of the due process clause of the Fourteenth Amendment and of Section 8 of Article I of the Tennessee Constitution and thus the Telephone Company would be entitled to the independent judgment of the Court as to both the law and the facts. *Ohio Valley Water Co. v. Ben Avon Borough,* 253 U.S. 287, 289, 40 S.Ct. 527, 64 L.Ed. 908, and our own recent case, *Southern Continental Telephone Co. v. Railroad & Public Utilities Commission,* 201 Tenn. 692, 285 S.W. 2d 115.

By the Fourteenth Amendment of the Federal Constitution it is provided that no State shall deprive any person of property without due process of law, nor deny any person within its jurisdiction the equal protection of the laws. As we know, Article I, Section 8, of our Tennessee Constitution and the Fourteenth Amendment, just referred to, are so closely aligned that they are almost identical. It has long been established that when a Commission or a legislative branch of the government fixes rates that a utility may charge that it must fix fair rates of return to both utility and to the consumer of the product furnished by the utility. When these rates are fixed so low that the utility cannot get a fair return this amounts to the taking of property for public use without just compensation and is confiscatory. *Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819, and many cases there discussed. See also *City of Knoxville v. Knoxville Water Co.,* 212 U.S. 1, 16, 29 S.Ct. 148, 53 L.Ed. 371; *Willcox v. Consolidated Gas Co.,* 212 U.S.

19, 41, 29 S.Ct. 192, 53 L.Ed. 382, 48 L.R.A., N.S., 1134, 15 Ann. Cas. 1034.

The Telephone Company in this last bill prayed for and moved that the Court remand the cause to the Commission so that the Commission could receive evidence showing the Telephone Company's operating experiences and results under the rate order of the Commission. This motion and request of the Telephone Company was very strenuously objected to by the Commission and is the real point of this appeal.

The Court granted the motion, ordered the Commission to receive this additional evidence and any other that they might desire to take and to make this a part of the record, and for them, that is, the Commission, to make any modifications in its previous findings that it might desire. There was no time limit for the taking of this additional evidence and there were no restrictions placed upon the Commission's hearing and receiving of this additional evidence. The Commission refused to have anything to do with the taking of this additional evidence because they thought it was beyond the scope of the statute providing for a remand to the Commission. They entered an order to this effect. Upon this being brought to the attention of the Chancellor the Commission and each individual member thereof was cited before the Chancellor for contempt. Upon this citation being served the Commission came into court and purged themselves of contempt by agreeing to, and filing the evidence which had been taken by the Telephone Company in the presence of counsel for the Commission and the cities, but in the absence of any cross-examination and under the objections of the Commission.

We thus come squarely to the concededly determinative issue in this lawsuit which is stated by the Chancellor thus:

"1. Is the evidence taken and offered by complainant under the order of remand proper, relevant and competent evidence to be considered in the determination of this cause?

"2. Does said evidence, which is undisputed and uncontradicted, establish a case of confiscation of complainant's property?"

In our view and judgment of the matter this is where the Commission missed the entire point in the lawsuit. That body took an adamant position that it did not have to hear any additional evidence or do anything about this rate case because as it saw it under the statutes governing the Commission that Commission only had to reconsider the matter when a new rate had been established.

As we see it the case here though presents an entirely different proposition. This hearing, under this amended and supplemental bill, is not one under the petition for *certiorari* hereinbefore referred to but is one coming under the original jurisdiction of the Chancery Court where there have been facts alleged of constitutional confiscation. Under such a bill the Chancellor has indeed very broad powers and it is his duty, if he thinks it necessary, to see that justice is done to remand the case for the taking of additional proof. This question has arisen many times in lawsuits between individuals or corporations but as far as we know it has not arisen between the Chancery Court and the Commission, as the

474

appellant is here. See cases holding to this effect such as *Randolph v. Merchants' Nat. Bank,* 77 Tenn. 63; *Ridley v. Coleman,* 33 Tenn. 616; *Sadler v. Mitchell,* 162 Tenn. 363, 33 S.W.2d 891; Code Section 27-329, T.C.A., and lastly Gibson's Suits in Chancery, Crownover, Fifth Edition, Volume 2, Section 1209.

The authors of American Jurisprudence in Volume 42, page 689 at Section 248 say that:

"the general rule is that the courts, even in the absence of statute, have such power where it is necessary to effectuate the demands of justice, * * *".

And:

"There is nothing in the principles governing judicial review of administrative acts which precludes the courts from giving an administrative body an opportunity to meet objections to its order by correcting irregularities in procedure, or supplying deficiencies in its record, or making additional findings where these are necessary, or supplying findings validly made in the place of those attacked as invalid."

And:

"If a board or commission has failed to make an essential finding and the record on review is insufficient to provide the basis for a final determination, the proper procedure for the court is to remand the case for further proceedings before the board."

Each of these statements are supported by good authority which we have examined. We think unquestionably that in a case of this kind the Chancellor had the right to

remand this case for this purpose and it was his duty under the factual allegations.

In 1954 the Supreme Court of Michigan had almost the identical question before it in the case of *General Telephone Co. of Michigan v. Michigan Public Service Commission*, 341 Mich. 620, 67 N.W.2d 882-885. That Court held that under a Michigan statute which is very similar to one that we have which will hereinafter be referred to, that the Commission was clearly in error in the failure to hear this additional evidence and act accordingly. That Court relied upon an Indiana case, *Public Service Commission v. Frazee*, 188 Ind. 573, 122 N.E. 328, and quoted from it partially as follows:

"This clearly shows that it is proper to hear evidence of things happening after such an order is entered to properly determine whether such order is valid or invalid."

This Indiana case cites among others as authority for its position the case of *Wilcox v. Consolidated Gas Co.*, *supra*. Among other things the Michigan Court said:

"We believe that the circuit court properly exercised its general equity jurisdiction to protect the company from confiscatory rates during the interval that the court realized must elapse between the time the .commission refused to give consideration to the testimony regarding the impact of its order upon the company during 1952 and the time when said commission would give that consideration." At page 888 of 67 N.W.2d.

The Commission in refusing to consider this additional evidence relies upon the case of *Interstate Com-*

*merce Commission v. Jersey City,* 322 U.S. 503, 64 S.Ct. 1129, 88 L.Ed. 1420, wherein it is held that rehearings before administrative bodies are not matters of right but are pleas of discretion which discretion is to be exercised by the administrative body and not of the reviewing body. In that case the Supreme Court of the United States speaking through the late Mr. Justice Jackson, in a very comprehensive discussion of the matter, said that in only one or possibly two instances had it ever been held that the reviewing body had abused its discretion. We think that is not authority for the proposition as here raised. The question here raised is the power and right of the Court of Chancery to see that justice is done between the parties, and in doing so it is the court's discretion that is exercised, to remand the case so that additional proof may be brought in, so that justice may be done between the parties. In such a situation it is for the court under a factual charge of confiscation to use its discretion as to whether or not the proof is in and not the reviewing body or body that hears it. This distinction must be kept in mind. This has now turned into a case for the court to determine, and what proof, etc., is necessary to determine that, and not to the Commission who hears the proof to make the rate. The court does not make the rate but determines whether or not the rate as fixed by the Commission under the facts before it is confiscatory under principles hereinafter to be discussed.

The Courts of equity have and do grant such relief. *Smyth v. Ames, supra; Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150; *Bronx Gas & Elec. Co. v. Public Service Commission,* 190 App.Div. 13, 180 N.Y.S. 38.

With the reasons above expressed we are satisfied that the Chancellor was well within his rights in allowing the taking of additional evidence and in remanding the case to the Commission for this purpose. The Commission though acting under a misapprehension as to its duties failed to consider this evidence. The Commission should have, under its admitted statutory rights to have a new hearing and fix rates at any time that it deems fit, considered this evidence, and offered additional evidence if it deemed fit, and then on this evidence have adjusted the rate as fixed by it in its final order or reached the conclusion that this additional evidence in no wise affected that rate.

It is not necessary for us to consider herein on this question Section 65-224 and Section 65-228, T.C.A., in reference to the admission of and taking of this additional evidence. We have stated above that we think that this evidence is admissible under the inherent rights of the court acting on this constitutional question. The statutes just referred to which are part of the Acts of Chapter 162 of the Public Acts of 1953 are not pertinent or necessary for consideration herein. The probability is that the provisions of those acts were not intended to affect, one way or the other, where the question is whether or not a party's property has been unconstitutionally confiscated. For this reason we decline to say whether or not we think those statutes are applicable herein—it is not necessary to say one way or the other.

The Commission very forcefully argues that under the two Code Sections last cited and particularly under Section 65-228, that the taking of this additional proof is not authorized. This argument is based on the wording

of the statute and on the interpretation that Federal Courts have given to similar statutes in these Commission matters. The Commission wholly fails to distinguish between the action here which is a suit under the traditional inherent equity powers of the Court and those based on the statute similar to that in question. It is argued by the Commission that this statute is patterned after the Federal Statute and that since the Commission's foundation is based on Federal Statutes that then we will give the statute the interpretation that the Federal Courts do, citing as authority therefor *Hoover Motor Express v. Railroad & Public Utilities Comm., supra*. For the reasons above expressed and what is said in the paragraph immediately preceding this we do not think it is necessary to pass on this question, as these statutes are not necessary for the Court to have the authority which it exercised herein.

We go along with the Supreme Judicial Court of Massachusetts in *Lowell Gas Co. v. Department of Public Utilities,* 324 Mass. 30, 84 N.E.2d 811, 817, when it said.

"Our conclusion means that inquiry here on the issue of confiscation is not confined to the findings of the department or to the evidence introduced before the department. See *Crowell v. Benson,* 285 U.S. 22, 63, 52 S. Ct. 285, 76 L.Ed. 598. A determination of rates is necessarily made in large part upon a view taken through the dim lenses of prophecy. When a rate order is challenged on constitutional grounds in this court, our observations must be undertaken with the improved vision of intervening experience. And such, for many years at least, was the position of the Supreme Court." (Citing many cases from the Supreme Court of the

United States including some of those hereinbefore referred to.)

In this case the Supreme Court of the United States denied *certiorari*. 338 U.S. 825, 70 S.Ct. 71, 94 L.Ed. 501.

Having determined that this evidence was admissible we now come to consider such evidence. The evidence consists of a deposition of a man by the name of Harmon who is an expert accountant employed by the Telephone Company. His testimony is summarized in two exhibits which are attached to his testimony.

The Commission found that a fair and reasonable return to the Company on its common stock capital was 7.60% to 7.80% and that the fair and reasonable return required on the rate base was 6.1%. The Chancellor found as to this witness' testimony that:

"Exhibit 'A' to his deposition deals with the annual rate of return actually being realized by the company upon its adjusted net average investment, computed according to the formula used by the Commission, itself, and shows the additional net operating income and gross revenue which would be required for the company to earn a 6.1% rate of return upon its adjusted net average investment, all as reflected by the company's actual intrastate operating experience and results for the four-month period ending June 30, 1956. This exhibit shows:

"(1) The company's adjusted net average investment for the period adjusted and computed according to the method used by the defendant Commission, itself, was $143,972,296.00

"(2) The company's net annual operating income arrived at by taking its actual net operating income

for the period, computing it upon an annual basis, adjusting it to eliminate the effect of a May 1956 wage increase, and further adjusting it to assume the theoretical income tax savings under a 45% debt ratio, which was imposed by the Commission, is $5,775,333.00.

"(3) The company's annual rate of return upon its adjusted net average investment, $5,775,333.00 ÷ $143,-972,296.00, is 4.01%, or 2.09% less than the rate of return of 6.10% which was found to be proper and allowed by the Commission.

"(4) The additional net operating income which is required to enable the company to earn 6.10% on its adjusted net average investment is $3,009,021.00, and additional gross revenue is $6,648,395.00.

"It is explained in the deposition that the company's operating results, showing a deficiency of 2.09% in the rate of return allowed by the Commission, and in what it is actually realizing, is due primarily to the four specific errors assigned by the complainant in its attack upon the rate order, viz., the failure of the Commission to give effect to the 1955 wage increase, the addition in plant in service during the last nineteen months preceding the order, the 1955 increase in ad valorem tax assessment of approximately $10,000,-000.00, and the December 1955 increase prescribed by the Federal Communications Commission in depreciation expense for the company. The witness Harmon details the additional gross revenues which would be required to offset each of these items and concludes that a total additional gross revenue of $3,932,000.00 would be required to offset them."

■ The Chancellor then, in this feature, concludes that merely because under the rate as fixed by the Commission does not yield 6.1% return does not necessarily mean it is confiscatory and unconstitutional. He correctly reasons that it is not the actual rate of the return which is being realized by the Company but whether or not the return that is being realized is just and reasonable for the Company under the proven circumstances. In this he borrowed the reasoning of the *Federal Power Company v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, and in particular *Bluefield Waterworks & Improvement Co. v. Public Service Comm.,* 262 U.S. 679, 692, 693, 43 S.Ct. 675, 679, 67 L.Ed. 1176, wherein that court said:

"What annual rate will constitute just compensation depends upon many circumstances, and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its

credit and enable it to raise the money necessary for the proper discharge of its public duties.''

And in thus considering the matter the Chancellor properly considered that the rate of return as fixed by the Commission must provide a reasonable return not only at the very time that it was fixed or at the time of the investigation but also for a reasonable time in the immediate future. *McCardle v. Indianapolis Water Co.*, 272 U.S. 400, 47 S.Ct. 144, 71 L.Ed. 316. At the same time he realized and reasoned properly, we think, that the returns being received under the fixed rate should be compared with the returns which probably would be realized under new and proposed rates. *Smith v. Illinois Bell Tel. Co.*, 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255. Thus it was that it seemed reasonable to him, as it does to us, that the rates that were sought by the application in 1954, and on a comparison, then were compared with the rates and the return to the Company under the new rate as fixed by the Commission in their January audit in 1956.

Thus on this proof which was not contradicted the Chancellor correctly found that the rates as prescribed by the Commission do not produce the minimum rate of return on equity capital which the Commission itself found was to be necessary. He likewise found that the rates prescribed by the Commission do not produce the rate of return on the adjusted net investment rate base which the Commission itself found was necessary.

He also found, and his finding is well supported by this additional proof, that this rate as fixed by the Commission in 1956 was confiscatory in that the return was

not sufficient to meet the requirements as laid down in *Federal Power Commission v. Hope Natural Gas Co., supra,* when that court among other things said [320 U.S. 591, 64 S.Ct. 288]:

"From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. (Citing authorities) * * * That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." See authorities.

In this reasoning the Chancellor recognized the fact that a reasonable rate was not necessarily any particular figure or decimal point but is one that is in the zone of reasonableness rather than a mathematical point of one, two, three, four, five, or any other number, was whatever was in the zone of reason taking into consideration all the facts and circumstances.

Of course the Commission in fixing these rates must necessarily, within reason, fix a certain definite period on which they establish the rate base but in considering this period they should also consider the experiences of the past in reference to experiences of the future and fix the rate with reference to what possibly may happen in the future. In a similar state of facts to that involved in this case the Supreme Court of the United States speaking through the late Mr. Justice Cardozo in *West Ohio Gas Co. v. Public Utilities Commission of Ohio,* 294 U.S. 79, 55 S.Ct. 324, 325, 79 L.Ed. 773, has this to say:

"Besides the figures for 1929, there was evidence, full and unchallenged, as to the actual revenue and outlay for 1930 and 1931. The commission refused to give any heed to that evidence in fixing the new rates. It did this in the fact of a petition for rehearing which sharply brought to its attention the effect of such exclusion."

(Let us compare this statement, in our minds, with the factual situation here: Here the Chancellor remanded it to the Commission to take additional proof which proof was taken and showed these things above indicated as quoted from the Chancellor.)

"If heed had been given to the later years, the return for 1930 would have been seen to be 4.23 per cent., and for 1931 only 3.68 per cent., all this, moreover, on the assumption that further error was not committed in the classification or disallowance of operating charges. If such error existed, the return would be even lower.

"We think the adoption of a single year as an exclusive test or standard imposed upon the company an arbitrary restriction in contravention of the Fourteenth Amendment and of 'the rudiments of fair play' made necessary thereby. (Citing authorities.) The earnings of the later years were exhibited in the record and told their own tale as to the possibilities of profit. To shut one's eyes to them altogether, to exclude them from reckoning, is as much arbitrary action as to build a schedule upon guesswork with evidence available. There are times, to be sure, when resort to prophecy

becomes inevitable in default of methods more precise. At such times, 'an honest and intelligent forecast of probably future values, made upon a view of all the relevant circumstances' (citing authorities) is the only organon at hand, and hence the only one to be employed in order to make the hearing fair. But prophecy, however honest, is generally a poor substitute for experience.''

This authority, last quoted from, is attacked by the Commission because it takes up different years. The principles involved therein though are exactly the same as those in the instant case. If a few months can show the rate fixed to be so erroneous as it is shown here in these few months, there is no reason why the Commission should not take and adjust it to make a fair return for both the Company, and a fair rate for the users of the utility to pay, even if the Commission had to establish a new hearing.

The Chancellor found in this case based on this evidence of Harmon that:

''Therefore, accepting what the Commission found as the necessary return upon the equity capital of the complainant as being correct, the uncontradicted proof shows that the rates prescribed and allowed by the Commission do not produce that return, but actually produce less than two-thirds of that return.

''From this inescapable conclusion, based upon the uncontradicted proof in the record of the actual operating experience of the company, the Court can reach no conclusion other than that the order of the Commis-

sion of January 26, 1956, under review here, does not allow a 'just and reasonable' rate of return to the complainant, and is thus confiscatory, unconstitutional, illegal and void.''

The Court thus made an independent finding of fact which is supported by material evidence herein that the rate as fixed by the Commission was confiscatory because it did not allow a sufficient return to the Company to enable the Telephone Company to attract and obtain necessary additional capital with which to perform the services required by the rate order.

The Tennessee Public Service Commission is in the service of the public. They are representing the public at large in fixing reasonable and just rates for public service utilities to charge in intrastate rates for public service to the people of Tennessee. As such a body its duties are to a large extent administrative and may be to some extent quasijudicial but on the whole it is a legislative body because most of these things which it does, that is, fixing rates for various utilities are things that the Legislature would do through committees. Thus this Commission as created has necessarily a body of experts who work for and with it to fix and carry out these rates. The product of this expert judgment in fixing these rates carries with their fixing a presumption of validity. When these rates are attacked there is a heavy burden on those who attacked them to make a convincing showing that the rates are invalid. At the same time though this Commission should not be adamant when a court has before it a case of confiscation, and there are certain factual facts alleged of confiscation, and a court remands a case

to the Commission to answer the question, then the Commission should under some of its statutory powers, even if it comes to initiating a new rate hearing, hear and consider this evidence. The court in acting on a confiscation case is not making a rate. All the court is doing is to hold that the rate fixed by the Commission under the proof before the court is confiscatory, illegal and void. When this is held the rate goes back to that as fixed by the utility when it, as it had a right under common law and statute, filed the set of rates it was going to require. This Court having found that there is material and ample evidence to support the finding of the Chancellor that the rates herein were confiscatory holds that the rate as fixed by the Commission was confiscatory, illegal and void. What this means is that the rate as filed by the Company as of November 10th, to become effective December 10, 1954, go into effect and remain in effect until the Commission through its statutory powers now initiates a new hearing, if it deems under the proof here that one is necessary. See *Smyth v. Ames, supra; Smith v. Illinois Bell Tel. Co.,* 270 U.S. 587, 46 S.Ct. 408, 70 L.Ed. 747.

For the reasons above expressed the decree of the Chancellor is affirmed with costs against the Commission out of funds provided by statute for such purposes.

We heretofore renewed an injunction sought by the Company against the Commission seeking to withhold the putting into effect the rate order of the Commission pending the final determination of this case. We on the rule of law that the findings of the Chancellor were correct until overcome by competent proof reinstated that injunction based on the fact that the Company would

give bond to return to any subscribers the extra amount paid during that period of time. Now after having heard argument, read the briefs and authorities and the record in this case, we are satisfied that the Chancellor was right and the refunding bond now in effect will be discharged. A decree may be entered accordingly.