# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### January 22, 2014 Session

## LAUREL HILLS CONDOMINIUMS PROPERTY OWNERS' ASSOCIATION v. TENNESSEE REGULATORY AUTHORITY

### Appeal from Tennessee Regulatory Authority
### No. 1200030    Director David F. Jones

### No. M2013-01392-COA-R12-CV - Filed April 14, 2014

A water utility challenges the authority of the Tennessee Regulatory Authority to order it to divest itself of the water system and to continue providing service until the sale. We find no error in the actions of the Tennessee Regulatory Authority.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Tennessee Regulatory Authority Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., and RICHARD H. DINKINS, JJ, joined.

Donald L. Scholes and Benjamin A. Gastel, Nashville, Tennessee, for the appellant, Laurel Hills Condominiums Property Owners' Association.

Kelly A. Cashman-Grams and Shiva K. Bozarth, Nashville, Tennessee, for the appellee, Tennessee Regulatory Authority.

Melanie E. Davis, Maryville, Tennessee, for the Customer Intervenors.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; and Charlena S. Aumiller, Assistant Attorney General; for the Consumer Advocate and Protection Division of the Tennessee Attorney General.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Laurel Hills Condominiums Property Owners' Association ("Laurel Hills"), a Tennessee nonprofit homeowners' association, purchased a water system from Moy Toy, LLC on May 1, 2011 for $400,000.[1] Michael McClung was the president of Laurel Hills; he was also the managing member of Moy Toy. Laurel Hills obtained a revocable license from Moy Toy for the use of the water system infrastructure.

The Laurel Hills water system serves the homes on Renegade Mountain; this includes approximately 50 customers, one of which is a condominium with 84 residential units. Laurel Hills purchases water from the Crab Orchard Utility District and pumps the water up Renegade Mountain for distribution to its customers. The system was originally constructed in the 1970s and 1980s. When Laurel Hills purchased the system, the pumps and water tank were in need of repair and not in compliance with Tennessee Department of Environment and Conservation ("TDEC") requirements. Laurel Hills made some improvements to the system to address the TDEC violations.

Laurel Hills contracted with Renegade Mountain Timeshares, LLC ("RMT") to perform work on the water system. Laurel Hills obtained a loan or line of credit from RMT in the amount of $53,038, of which $38,000 was used. Mr. McClung was the managing member of RMT.

In June 2011, Laurel Hills notified its customers of an increase in water rates from $25.00 per month ($20.00 per month for condominium residents) to $86.40 per month effective June 1, 2011. Some customers negotiated a lower rate of $43.20 per month with Darrell McQueen, the water system engineer. In October 2011, however, Laurel Hills sent out notices reinstating the $86.40 rate and demanding retroactive payment to June 2011. In a December 30, 2011 letter, Laurel Hills stated that water would be terminated to all customers effective January 31, 2012 because of the failure of some customers to pay their monthly bill.[2] Because the system did not have individual shut-off valves at each customer's location, Laurel Hills could not terminate service to individual customers.

---

[1]The State Comptroller valued the utility plant at $15,000 for tax purposes.

[2]In mid-December 2011, members of the Renegade Mountain Community Club ("RMCC") sued Michael McClung and Phillip Guettler for breach of fiduciary duty in their capacity as RMCC directors. Mr. Guettler was also a director of Laurel Hills.

2

Laurel Hills actually turned off the water system on February 1, 2012. The customers immediately filed for injunctive relief and received a temporary restraining order from the chancery court. For a brief time, the customers used a water tanker truck to supply water; according to some of the customers, Mr. McClung and Phillip Guettler, a Laurel Hills board member, drove by and made fun of the people around the tanker truck. As a result of the restraining order, Laurel Hills restored water service on February 6, 2012.

In addition to ordering Laurel Hills to refrain from cutting off water service, the chancery court ordered Laurel Hills to contact the Tennessee Regulatory Authority ("TRA") regarding system regulation and permitted Laurel Hills to charge a monthly rate of $43.20 until the rates could be reviewed by the TRA. Laurel Hills filed a petition with the TRA on April 10, 2012 requesting a certificate of public convenience and necessity ("CCN") for the water system. A group of Laurel Hills customers ("Customer Intervenors") filed a joint petition to intervene on May 1, 2012.

On May 7, 2012, Laurel Hills withdrew its petition with the TRA, stating that it intended to "cease providing water service with its system to any person other than itself" and, therefore, would no longer be considered a public utility under TRA jurisdiction. The TRA issued a notice to appear requiring Laurel Hills to appear and show cause why the TRA should not convene a proceeding to impose civil penalties and sanctions against Laurel Hills for operation of a public utility without a CCN. Laurel Hills filed a response but failed to appear at the conference. The Consumer Advocate of the Office of the Tennessee Attorney General petitioned to intervene. The TRA issued a show cause order for six alleged violations of state law and created a docket number for the show cause proceedings.

The temporary restraining order compelled Laurel Hills to reinstate its petition with the TRA. Laurel Hills then filed its first amended petition, which included a request for a monthly rate of $134.26. (The original petition asked the TRA to approve the rate of $86.40 a month.). In the following months, all parties filed testimony and engaged in discovery. The TRA filed multiple discovery requests to Laurel Hills to obtain the information it needed to determine whether a CCN was appropriate.

The hearing was held on February 13, 2013. Multiple customers provided public comment. The TRA heard testimony from the following witnesses: Michael McLung, President of Laurel Hills; Dr. Christopher Klein and William Novak, experts for the Consumer Advocate; John Moore, President of the RMCC and a water customer; Everett Bolin, Jr., General Manager of the Crab Orchard Utility District; Ronnie Hill, a RMCC director, water customer, and accountant; and Robert Adkins, a Customer Intervenor. The TRA panel took the matter under advisement, and the parties submitted post-trial briefs.

On April 18, 2013, the TRA issued its order denying a CCN and requiring Laurel Hills to divest itself of the water system. The TRA's order includes detailed analysis supporting its conclusion that Laurel Hills lacked the managerial and financial ability to operate a water utility. While the TRA found that Laurel Hills had "retained personnel such that it has the technical ability to operate a water utility at present," the panel went on to find that "it is unlikely that Laurel Hills will maintain its technical ability going forward." Moreover, the TRA concluded that Laurel Hills had not demonstrated adherence to applicable statutes, rules or orders. Based upon all of these findings, the TRA denied Laurel Hills's first amended petition.

The TRA determined that Laurel Hills's incurred debts were not prudent debts of the water utility. The TRA went on to determine that, "based upon the best evidence available that is contained in the record, a just and reasonable monthly rate for water service is $33.10."

Laurel Hills was ordered to divest itself of the water utility "within 60 days, or no later than June 7, 2013," and to submit evidence of the divestiture to the TRA for approval. The order further provides: "If Laurel Hills is unable to divest its water utility by no later than June 7, 2013, Laurel Hills shall file a notice with the Authority of its inability to divest itself of the water utility and shall appear before the Authority . . . to explain its efforts to divest itself of the water utility." Prior to the sale of the water utility, Laurel Hills remained a public utility and "shall furnish safe, adequate and proper service and keep and maintain its property and equipment in such condition as to enable it to do so . . . ." The show cause proceeding was to remain in abeyance until after the divestment deadline.

Laurel Hills subsequently sought and received a continuance of the divestment twice and, in its motions, explained its efforts to find a potential buyer.

On appeal, Laurel Hills does not challenge the TRA's decision to deny it a CCN. Rather, Laurel Hills argues: (1) that the TRA violated Laurel Hills's constitutional rights by requiring it to divest itself of the water system; and (2) that the TRA lacked the authority to deny a CCN while requiring the utility to continue to provide service. The Customer Intervenors and the Consumer Advocate assert that the TRA exceeded its statutory authority or acted arbitrarily and capriciously when it awarded legal fees for Laurel Hills's efforts to obtain a CCN.

STANDARD OF REVIEW

A person aggrieved by a decision of the TRA must file a petition for review pursuant to the Uniform Administrative Procedures Act ("UAPA"); and these appeals are taken

4

directly to the middle division of this court. Tenn. Code Ann. § 4-5-322(b)(1)(B)(iii). The UAPA limits our scope of review as follows:

> The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority of the agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
>
> (5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.
>
> (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h).

Under the UAPA, this court, like the trial court, must apply the substantial and material evidence standard to the agency's factual findings. *City of Memphis v. Civil Serv. Comm'n*, 239 S.W.3d 202, 207 (Tenn. Ct. App. 2007). Substantial and material evidence is "'such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration.'" *Macon v. Shelby Cnty. Gov't Civil Serv. Merit Bd.*, 309 S.W.3d 504, 508 (Tenn. Ct. App. 2009) (quoting *Pruitt v. City of Memphis*, No. W2004-01771-COA-R3-CV, 2005 WL 2043542, at *7 (Tenn. Ct. App. Aug. 24, 2005)). It is "'something less than a preponderance of the evidence, but more than a scintilla or glimmer.'" *Id.* (quoting *Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 280 (Tenn. Ct. App. 1988)).

The UAPA's narrow standard of review for an administrative body's factual determinations "suggests that, unlike other civil appeals, the courts should be less confident

that their judgment is preferable to that of the agency." *Wayne Cnty.*, 756 S.W.2d at 279. This court cannot displace the agency's judgment as to the weight of the evidence even where there is evidence that could support a different result. *Id.*

ANALYSIS

(1)

The first argument raised by Laurel Hills is that the TRA's action of ordering it to divest itself of the water system constitutes an unconstitutional taking "in that it fails to provide Laurel Hills adequate compensation for the water system."

As part of its constitutional argument, Laurel Hills asserts that the TRA lacks the authority to order it to divest itself of the water system. We disagree. Our Supreme Court has addressed the "plenary authority" vested in the TRA:

> [T]he General Assembly has charged the TRA with the "general supervisory and regulatory power, jurisdiction and control over all public utilities." Tenn. Code Ann. § 65-4-104 (1997 Supp.). In fact, the Legislature has explicitly directed that statutory provisions relating to the authority of the TRA shall be given "a liberal construction" and has mandated that "any doubts as to the existence or extent of a power conferred on the [TRA] . . . shall be resolved in favor of the existence of the power, to the end that the [TRA] may effectively govern and control the public utilities placed under its jurisdiction . . . ." Tenn. Code Ann. § 65-4-106 (1997 Supp.). The General Assembly, therefore, has "signaled its clear intent to vest in the [TRA] practically plenary authority over the utilities within its jurisdiction." *Tennessee Cable Television Ass'n v. Tennessee Public Service Comm'n*, 844 S.W.2d 151, 159 (Tenn. [Ct.] App. 1992). To enable the TRA to effectively accomplish its designated purpose— the governance and supervision of public utilities—the General Assembly has empowered the TRA to "adopt rules governing the procedures prescribed or authorized," including "rules of practice before the authority, together with forms and instructions," and "rules implementing, interpreting or making specific the various laws which [the TRA] enforces or administers." Tenn. Code Ann. § 65-2-102(1) & (2) (1997 Supp.).

*BellSouth Adver. & Publ'g Corp. v. Tenn. Reg. Auth.*, 79 S.W.3d 506, 512-13 (Tenn. 2002) (quoting *Consumer Advocate Div. v. Greer*, 967 S.W.2d 759, 761-62 (Tenn. 1998)). Thus, in the absence of some authority prohibiting such action, the TRA is authorized to take whatever action is necessary to effectuate its regulatory functions. It stands to reason that,

in order for the TRA to be able to enforce its regulations and orders, including orders regarding CCNs, the TRA must be able to order the sale of a water system it determines to be incompetent to carry out its role. *See* Tenn. Comp. R. & Regs. 1220-4-13-.11 (describing the process to be used by the TRA in establishing a receivership or a transfer of ownership to remedy deficiencies in a public wastewater utility).

The Fifth Amendment to the United States Constitution states that private property shall not be taken for public use without just compensation. Similarly, article one, section twenty-one of the Tennessee Constitution, provides, "[t]hat no man's particular services shall be demanded, or property taken, or applied to public use, without . . . just compensation being made therefor." Thus, the government is prohibited from taking private property for public use without just compensation. *Edwards v. Hallsdale-Powell Util. Dist.*, 115 S.W.3d 461, 464 (Tenn. 2003). Tennessee law recognizes two types of takings: physical occupation takings (involving a physical invasion of property or destruction of property rights) and nuisance-type takings (involving government interference with a landowner's use and enjoyment of his or her property, such as noise from an airport). *Id.* at 465-66. Federal law also recognizes regulatory takings—for example, through the adoption of a zoning ordinance. *Consol. Waste Sys., LLC v. Metro Gov't of Nashville & Davidson Cnty.*, No. M2002-02582-COA-R3-CV, 2005 WL 1541860, at *8-9 (Tenn. Ct. App. June 30, 2005).

In the present case, there is no "taking" of the property of Laurel Hills by the TRA. The TRA is not taking possession or control of the water system. Rather, the TRA is ordering Laurel Hills to sell the water system because Laurel Hills is not competent to continue to operate the system. The TRA's action is a valid exercise of the state's police power to protect public health and safety. *See Spencer-Sturla Co. v. City of Memphis*, 290 S.W. 608, 611 (Tenn. 1927) (discussion of police power and takings).[3]

---

[3]Even if there were a taking, there would be no constitutional violation because the TRA's order provides safeguards to ensure that Laurel Hills receives a reasonable price for the water system:

2. Laurel Hills Condominium Property Owners Association shall divest itself of the water utility within 60 days, or no later than June 7, 2013.

3. Laurel Hills shall submit evidence of such divestiture to the Authority for its approval.

4. If Laurel Hills is unable to divest its water utility by no later than June 7, 2013, Laurel Hills shall file a notice with the Authority of its inability to divest itself of the water utility and shall appear before the Authority at the time and date which may be ordered by the Authority to explain its efforts to divest itself of the water utility.

The final order allows Laurel Hills to request additional time and, at the time of oral argument, the TRA had already granted two requests for additional time made by Laurel Hills. In the interim, Laurel Hills is allowed to charge a reasonable rate to its customers. In the event that Laurel Hills sells the water utility to another public utility, the divestiture would be subject to TRA approval. This process includes sufficient safeguards designed to protect the interests of Laurel Hills and to provide just compensation.

Laurel Hills next argues that the TRA does not have the authority to deny a CCN while requiring the utility to continue to provide service.

In support of its argument, Laurel Hills relies upon the language of Tenn. Code Ann. § 65-4-201, which provides, in pertinent part: "No public utility shall establish or begin the construction of, or operate any line, plant, or system . . . without first having obtained from the authority [TRA], after written application and hearing, a certificate that the present or future public convenience and necessity require or will require such construction, establishment, and operation . . . ." According to Laurel Hills's interpretation, this statute prohibits the TRA from ordering a public utility without a CCN to operate a water system.

This issue requires this court to interpret and construe the statutes governing the TRA, Tenn. Code Ann. §§ 65-4-10–65-4-506. In construing statutes, we are guided by the following principles:

> The role of this Court in construing statutes is to ascertain and give effect to the legislative intent. *Cronin v. Howe*, 906 S.W.2d 910, 912 (Tenn. 1995). Whenever possible, legislative intent is to be ascertained from the natural and ordinary meaning of the language used, without forced or subtle construction that would limit or extend the meaning of the language. *Id.* We must avoid strained constructions which would render portions of the statute inoperative or void. *State v. Turner*, 913 S.W.2d 158, 160 (Tenn. 1995). Instead, we must apply a reasonable construction in light of the purposes and objectives of the statutory provision. *Id.*

*Consumer Advocate Div. v. Greer*, 967 S.W.2d 759, 761 (Tenn. 1998). We must consider the statute as a whole and resolve any conflict so as to provide for a harmonious operation of the law. *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 903 (Tenn. 2011); *Cronin v. Howe*, 906 S.W.2d 910, 914 (Tenn. 1995).

The legislature expressly delegated to the TRA "general supervisory and regulatory power, jurisdiction, and control over all public utilities, and also over their property, property rights . . . so far as may be necessary for the purpose of carrying out the provisions of this chapter." Tenn. Code Ann. § 65-4-104. The TRA's enabling statutes "shall be given a liberal construction, and any doubt as to the existence or extent of a power conferred on the authority . . . shall be resolved in favor of the existence of the power, to the end that the authority may effectively govern and control the public utilities placed under its jurisdiction by this chaper." Tenn. Code Ann. § 65-4-106. As discussed above, our Supreme Court has

acknowledged the broad authority conferred by the legislature in these statutes to be "practically plenary." *BellSouth Adver.*, 79 S.W.3d at 512.

On appeal, Laurel Hills does not dispute that it is a "public utility" subject to TRA regulatory jurisdiction and authority. *See* Tenn. Code Ann. § 65-4-101(6)(A). Pursuant to Tenn. Code Ann. § 65-4-201(a), a public utility within the purview of the TRA must obtain a CCN. We do not interpret this provision as limiting or restricting the TRA's authority to govern and control all public utilities. Tennessee Code Annotated section 65-4-114(1) not only authorizes the TRA to require a public utility to furnish water service, but also to maintain a certain quality of water service:

> The authority has the power, after hearing, upon notice, by order in writing, to require every public utility, as defined in § 65-4-101, to (1) furnish safe, adequate, and proper service and to keep and maintain its property and equipment in such condition as to enable it to do so; . . .

This provision allows the TRA to require "*every* public utility," not just those that have obtained a CCN, to furnish safe, adequate, and proper service. Tenn. Code Ann. § 65-4-114 (emphasis added). Tennessee Code Annotated section 65-4-117(a)(3) provides that the TRA has the authority to "fix just and reasonable standards, classifications, regulations, practices or *services to be furnished*, imposed, observed and followed thereafter by *any* public utility." (Emphasis added). Moreover, pursuant to Tenn. Code Ann. § 65-4-115, no public utility shall "provide or maintain any service that is unsafe, improper, or inadequate, or withhold or refuse any service which can reasonably be demanded and furnished when ordered by the authority."

It should also be noted that, in order to maintain a CCN, a public utility must prove that it has the managerial, financial, and technical abilities to serve a designated territory. Tenn. Code Ann. §§ 65-4-201(c)(2), 65-4-204. The standards for proving competence to obtain a CCN under § 65-4-201 are higher than those required to show the ability to furnish safe, adequate, and proper service under Tenn. Code Ann. § 65-4-114.

The interpretation urged by Laurel Hills would prohibit the TRA from regulating any public utility without a CCN. This construction is inconsistent with the legislative purpose and plan for the regulation of public utilities. Without the ability to regulate public utilities that do not have a CCN, the TRA would be thwarted in its ability to enforce the law against utilities that are operating unsafely.

We conclude that the TRA had the authority to order Laurel Hills to continue running the water utility temporarily, until such time as the utility was sold.

9

Both the Customer Interveners and the Consumer Advocate challenge the TRA's award of attorney fees to Laurel Hills. They argue that a utility should not be able to recover attorney fees in a CCN proceeding when the CCN was denied.

In the proceeding before the TRA, Laurel Hills stated that it would incur "approximately $50,000 in legal fees for the CCN proceeding alone," all of which it argued was "properly recoverable." Furthermore, Laurel Hills took the position that all of the legal expenses it incurred in the two chancery court proceedings "were prudently incurred expenses and properly recoverable from ratepayers through utility rates." The Consumer Advocate objected to the recovery of any attorney fees by Laurel Hills. The Consumer Advocate asserted that, "if the CCN application is denied, then the expenses related to this proceeding will never benefit current and future ratepayers and are not 'used and useful' reasonable and prudent costs."

The TRA awarded Laurel Hills $46,783 for legal expenses. The panel disallowed recovery for the chancery court proceedings ($3,722.89) and for the show cause proceeding ($540), "all of which were initiated by the Petitioner's attempts to abandon water service to its customers." The TRA determined that "these activities did not benefit the customers of Laurel Hills and their costs should not be borne by those customers." The Consumer Advocate asserts that the TRA failed to provide an adequate explanation for its decision and that the legal expenses were not reasonable, prudent, and necessary operating costs of the utility.

Contrary to the premise of the Consumer Advocate's argument, the legal expenses were awarded in the context of a proceeding to obtain a CCN and to establish a just and reasonable rate. As part of its rate making authority, the TRA authorized some of Laurel Hills's legal expenses to be included in the calculation of the monthly rate charged to customers. We have previously discussed the plenary authority delegated to the TRA by the legislature. *BellSouth*, 79 S.W.3d at 512-13. Rate making is a legislative function delegated by the legislature that requires the TRA to make determinations of fact, apply its regulatory judgment and discretion, and balance and weigh many factors, policies, and interests. *Tenn. Cable Television Assoc. v. Tenn. Pub. Serv. Comm'n*, 844 S.W.2d 151, 159 (Tenn. Ct. App. 1992).

The scope of review applied to the decisions of administrative agencies acting within their specialized expertise is deferential and narrow. *Wayne Cnty.*, 756 S.W.2d at 279. Courts "will not disturb a reasonable decision of an agency with expertise, experience, and knowledge in the appropriate field." *S. Ry. Co. v. State Bd. of Equalization*, 682 S.W.2d 196,

199 (Tenn. 1984). Our Supreme Court has made the following statement regarding the scope of review applicable to rate making:

> The criteria by which the Commission should be guided have received only generalized comments in our reported decisions. This is proper because the courts are playing a limited role in reviewing actions which essentially are legislative in character. Rate making is not a judicial function and we accord the Commission great deference in reviewing its decisions. On fixing rates in general the Court has spoken in terms of what is just and reasonable "under the proven circumstances," of "regard to all relevant facts" and to a rate "in the zone of reasonableness."

*CF Indus. v. Tenn Pub. Serv. Comm'n*, 599 S.W.2d 536, 542 (Tenn. 1980) (quoting *S. Bell Tel. & Tel. Co. v. Tenn. Pub. Serv. Comm'n*, 304 S.W.2d 640, 647 (Tenn. 1957)). Furthermore, our courts have consistently recognized the presumption of validity attached to the TRA's exercise of its judgment and discretion in setting rates. *See CF Indus.*, 599 S.W.2d at 540; *Ky.-Tenn. Light & Power Co. v. Dunlap*, 178 S.W.2d 636, 638 (Tenn. 1944). A party seeking to overturn the TRA's ratemaking decisions must undertake a "heavy burden" of showing that the decisions are unjust and unreasonable in their consequences. *S. Bell*, 304 S.W.2d at 649.

The TRA has the authority to fix just and reasonable rates for any public utility within its jurisdiction. Tenn. Code Ann. §§ 65-5-101(a), 65-5-103(a). Our Supreme Court has held that "[t]he polestar of public utility rate establishment and regulation is the 'just and reasonable' requirement." *CF Indus.*, 599 S.W.2d at 542. The TRA must use its experience, technical competence, and specialized knowledge in fixing just and reasonable rates. *See* Tenn. Code Ann. §§ 65-2-109(4), 4-5-314(d). The parties agree that legal fees may be recoverable in rates as part of the reasonable and prudent costs necessary to provide utility service. *See Consumer Advocate & Protection Div. of the Office of the Attorney Gen. of Tenn. v. Tenn. Reg. Auth.*, No. M2011-00028-COA-R12-CV, 2012 WL 1964593, at *1 (Tenn. Ct. App. May 30, 2012); *Tenn. Am. Water Co. v. Tenn. Reg. Auth.*, No. M2009-00553-COA-R12-CV, 2011 WL 334678, at *26 (Tenn. Ct. App. Jan. 28, 2011).

The Consumer Advocate argues that "costs incurred by a utility as a result of failing to file for a CCN before establishing service are not recoverable because such costs are a result of failing to comply with the law and therefore cannot be an 'efficient' service under Tenn Code Ann. § 65-5-103(a)."[4] In *Consumer Advocate v. Tennessee Regulatory Authority*,

---

[4]The show cause proceeding against Laurel Hills was held in abeyance pending the resolution of this appeal. The purpose of that proceeding is to consider the appropriate actions to be taken

2012 WL 1964593, at *1, the court considered the extent of the TRA's authority to allow a utility to recover legal expenses. The Consumer Advocate asserted that the TRA had erred in allowing a gas company to recover $700,000 in legal expenses incurred in a proceeding where base rates were not set. *Id.* at *13. Further, the Consumer Advocate argued that the TRA's action in permitting the gas company to recover legal expenses in a non-rate case was "a dramatic change in regulatory practice," requiring the TRA to "clearly explain the basis of its authority to make such a change rather than merely relying on its general authority or citing the fact that the underlying litigation was 'complex.'" *Id.* at *17.

The court found the Consumer Advocate's arguments unpersuasive. The court emphasized that "[t]he authority granted to the TRA in this arena is clearly intended to be plenary." *Id.* at *19. Therefore, the court reasoned, the "onus . . . is on the Consumer Advocate to show a limitation on that plenary authority given to the TRA, and it has not done so." *Id.* As to the Consumer Advocate's assertion that the TRA "did not properly exercise its authority because it did not explain the reason for its decision," the court disagreed. *Id.* at *22. The court found the TRA's reasons in the record sufficient.[5] *Id.* In conclusion, the court stated:

> Given the TRA's plenary authority to regulate utilities, and the absence of a statute, regulation, or other authority prohibiting the TRA's actions, we hold that the TRA had the authority to permit the Gas Company to recover from its customers the reasonable and prudent litigation expenses incurred in the Asset Management Docket.[6]

---

against Laurel Hills for alleged violations of state law and TRA regulations.

[5]The TRA's order stated, in pertinent part:

> The panel found that [the Gas Company] was required by the Authority to participate in [the Asset Management Docket] and did incur the legal expense in a complex, lengthy and protracted proceeding. Additionally, the panel found that these costs were incurred in litigating the issues stemming from [the Gas Company's] prior rate case docket . . . .
>
> Therefore, the panel determined that [the Gas Company] should be allowed full recovery of the legal costs incurred in [the Asset Management Docket].

*Consumer Advocate*, 2012 WL 1964593, at *12.

[6]The purpose of the Asset Management Docket was to evaluate the Gas Company's asset management practices. *Consumer Advocate*, 2012 WL 1964593, at *12.

*Id.*

In this case, Laurel Hills was required by state law and by chancery court order to petition the TRA for a CCN and for the fixing of a just and reasonable rate. The TRA conducted a comprehensive financial examination and held a public hearing on the propriety of the rates proposed by Laurel Hills. After considering all of the evidence, the TRA fixed a just and reasonable rate of $33.10 per month; this rate includes an allocation of $46,783 for legal expenses, expenses which the TRA found to be directly related to the instant proceedings and necessary and prudently incurred. The TRA also excluded legal expenses resulting from the chancery court and show cause proceedings instituted by the TRA because they were related to Laurel Hills's attempts to abandon water service. Thus, the TRA made specific findings as to which of the legal expenses claimed by Laurel Hills it found appropriate for inclusion and which expenses it determined to be improper. Because the proceeding was for a CCN as well as for the establishment of rates, the TRA decided to amortize the legal expenses over 15 years. The TRA's decision is supported by substantial and material evidence in the record and we find no reason to overturn that regulatory decision.

As to the sufficiency of the TRA's order explaining its decision, the order contains detailed findings concerning all of the expenses claimed by Laurel Hills. The order clearly identifies those legal expenses that were included and those that were excluded. We must conclude that the TRA's order satisfies the requirements of Tenn. Code Ann. § 65-2-112 (regarding decisions in contested cases before the TRA) and § 4-5-314(c) (a provision of the UAPA regarding orders in contested cases generally) and would permit a court to conduct a meaningful review of the agency decision. *See Am. Ass'n of Retired Persons v. Tenn. Public Serv. Comm'n*, 896 S.W.2d 127, 135 (Tenn. Ct. App. 1994).

CONCLUSION

We affirm the decision of the TRA in all respects. Costs of this appeal are assessed against Laurel Hills, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE